Hillsborough-northern judicial district
No. 2003-303

CITY OF MANCHESTER SCHOOL DISTRICT *& a.*

v.

CITY OF MANCHESTER

Argued: January 15, 2004
Opinion Issued: March 15, 2004

*Wadleigh, Starr & Peters, P.L.L.C.*, of Manchester (*Dean B. Eggert* and *Jennifer L. Murphy* on the brief, and *Mr. Eggert* orally), for the plaintiffs.

*Thomas I. Arnold, III*, deputy city solicitor, of Manchester, on the brief and orally, for the defendant.

DUGGAN, J. In this declaratory judgment action, the defendant, City of Manchester (city), appeals an order of the Superior Court (*Mangones*, J.) granting summary judgment in favor of the plaintiffs, Manchester School District and School Administrative Unit #37 (collectively, the school district). The court ruled that the city acted without authority when, by charter amendment, it merged the school district with the municipal corporation thereby making the school district a city department. *See* RSA ch. 49-B (2003). We affirm.

The trial court found the following facts. In December 1999, the school district filed a petition for declaratory judgment, seeking a determination that it was not a department of city government. The Superior Court (*J. Nadeau*, C.J.) ruled that because the school district functions as a "substantially independent governmental entity," it was not a city department.

The board of mayor and aldermen then proposed an amendment to the city charter. The effect of the amendment was to merge the school district with the municipal corporation and make it a city department. The amendment also gave the mayor and aldermen authority to develop procedures for the administration of the school department budget. On November 6, 2001, Manchester voters approved the charter amendment.

In response, the school district filed a second petition for declaratory judgment, seeking a declaration that the charter amendment was unlawful. Both parties filed motions for summary judgment. The Trial Court (*Mangones*, J.) granted the school district's motion for summary judgment and concluded that "a specific legislative act must be in effect for a City to create a school department in derogation of general law on the issue." This appeal followed.

In reviewing the trial court's grant of summary judgment, we consider the affidavits and other evidence, and all properly drawn inferences in the light most favorable to the non-moving party. *Big League Entm't v. Brox Indus.*, 149 N.H. 480, 482 (2003). If our review of that evidence discloses no genuine issue of material fact, and if the moving party is entitled to judgment as a matter of law, we will affirm the grant of summary judgment. *Id.* We review the trial court's application of the law to the facts *de novo. Id.*

The sole issue for our review is whether the city had the authority to adopt a charter amendment that merges the school district with the municipal corporation, thus making the school district a city department. In deciding this issue, we consider our constitution, the home rule statutes and statutes governing the operation of school districts.

Under our constitution, the legislature has plenary control over municipalities. *See State v. Goffstown*, 100 N.H. 131, 133 (1956). Thus, "[municipalities] have only the powers which the State grants to them." *Id.* (quotation omitted). The legislature has authorized municipalities to adopt charters, which transfer power from the legislature and invest it in the governing body of the municipality. *See* 13 P. LOUGHLIN, NEW HAMPSHIRE PRACTICE, LOCAL GOVERNMENT LAW § 31, at 19 (1995).

In New Hampshire, prior to 1966, municipal charters "could be amended or repealed at the discretion of the legislature." *Id.* § 33, at 22. In 1966, Part I, Article 39, the home rule amendment, was added to the New Hampshire Constitution. *Id.* § 33, at 23. It provides:

> No law changing the charter or form of government of a particular city or town shall be enacted by the legislature except to become effective upon the approval of the voters of such city or town upon a referendum to be provided for in said law.

> The legislature may by general law authorize cities and towns to adopt or amend their charters or forms of government in any way which is not in conflict with general law, provided that such charters or amendments shall become effective only upon the approval of the voters of each such city or town on a referendum.

N.H. CONST. pt. I, art. 39.

The first paragraph of the amendment "prevents the legislature from altering the form of municipal government, as provided in any municipal charter without a referendum vote." LOUGHLIN, *supra* § 33, at 23. "The second paragraph of Article 39 is not self-executing and did not become operative until the enactment of legislation setting out the method of exercising such home rule powers." *Id.* § 63, at 48. The power available to municipalities under the second paragraph of Article 39 has been described as limited. *See id.* In stark contrast to the "unlimited legislative powers that some other states have granted to municipalities," the power available to cities and towns under New Hampshire's home rule amendment "is limited to the specified processes by which their charters or forms of government are adopted or amended." *Id.*

In 1979, the legislature enacted legislation to implement Part I, Article 39. *Id.* § 34, at 24. The current versions of the home rule statutes were adopted in 1991. *Id.* § 35, at 26. Together, these three statutes, RSA chapters 49-B, 49-C and 49-D, constitute a detailed, comprehensive scheme for the establishment and operation of local government. RSA chapter 49-B gives municipalities explicit authority to choose a form of government. Their choices, however, are limited. RSA 49-B:2, III (2003) limits a city's choice to the forms of government outlined in RSA chapter 49-C. *See* RSA 49-C:8 (2003) (explaining mayor-aldermen and council-manager plans). Likewise, RSA 49-B:2, II (2003) limits a town's choice to the forms of government outlined in RSA chapter 49-D. *See* RSA 49-D:2, :3 (2003 & Supp. 2003) (explaining town council-town manager plan and optional types of legislative bodies). Similarly, the structure of the form of government selected is dictated by RSA chapters 49-C and 49-D.

RSA chapter 49-B is the starting point for the formation of a local government. It "provides the statutory framework through which cities and towns may amend their actual forms of government, and grants them the power necessary to carry out such changes." LOUGHLIN, *supra* § 34, at 24. RSA 49-B:1 (2003) states:

> It is the purpose of this chapter to implement the home rule powers recognized by article 39, part first, of the constitution of the state of New Hampshire. To that end, the general court hereby provides a vehicle whereby a municipality may adopt a form of government that best addresses local needs. At the same time, however, the general court recognizes a need to require uniform procedures and practices when there is a corresponding state interest. Therefore, this chapter is intended only to provide a procedural framework by which a city or town may amend its actual form of government. Nothing in this chapter shall be construed to create any power in, or confer any power upon, any city or town beyond that necessary to carry out the amendment of a charter or form of government as set forth in this chapter. The general laws of this state shall remain in full force and effect, and they shall be construed to be consistent with this chapter to the greatest extent possible in the effectuation of this chapter's stated purpose. Accordingly, this chapter shall be strictly interpreted to allow towns and cities to adopt, amend, or revise a municipal charter relative to their form of government so long as the resulting charter is neither in conflict with nor inconsistent with the general laws or the constitution of this state.

RSA chapter 49-B then sets forth exceptionally detailed requirements for the adoption, amendment and revision of charters. To begin the process of adopting a charter, the municipality must establish a charter commission comprised of nine elected members. RSA 49-B:3, :4 (Supp. 2003). The commission is required to hold a public meeting within fourteen days of its own organizational meeting. RSA 49-B:4. The commission must issue a preliminary report within 180 days of its establishment and a final report within 225 days. *Id.* The statute also prescribes the procedure by which the charter, charter amendment or revision is submitted to the voters. RSA 49-B:6 (2003).

Here, the municipal charter denominates Manchester as a city. Therefore, the charter must adhere to the framework set forth in RSA chapter 49-C. *See* RSA 49-B:2, III. RSA chapter 49-C permits a city to select either the mayor-board of aldermen plan or the city council-manager plan as a form of government. RSA 49-C:8. Manchester has opted for the mayor-board of aldermen form of government. RSA chapter 49-C sets forth an exhaustive blueprint for this form of government.

The statute provides that the mayor, who is "the chief administrative officer and the head of the administrative branch of the city government," must be selected from the city-at-large. RSA 49-C:8, :16 (2003). The mayor is required to "devote full time to mayoral duties" and "shall preside" over meetings of the aldermen. RSA 49-C:11, :12 (2003). Additional powers and duties of the mayor are detailed in RSA 49-C:16.

The statute further states that the municipal charter must provide for the appointment of officers, as well as the establishment of departments, divisions and bureaus. Specifically, under RSA 49-C:20 (2003):

> The charter shall provide for the appointment of a city clerk, a treasurer, one or more assessors, a fire chief, a police chief, a health officer, a city solicitor, a general assistance administrator, and such other officers as may be necessary to administer all departments which the elected body and the charter shall establish.

Moreover, with respect to departments, RSA 49-C:21 (2003) provides:

> The city shall have departments, divisions, and bureaus as may be established by the charter or as the elected body may establish by ordinance. It shall be the duty of the first chief administrative officer, under the provisions of the charter to draft and submit to the elected body within 9 months after assuming office, an ordinance consistent with the charter which provides

for the division of the administrative service of the city into departments, divisions and bureaus and defines the functions and duties of each.

In this case, the city relies primarily upon RSA 49-C:21 to argue that it has "clear authority" to transform the school district into a city department. We disagree.

We interpret legislative intent from the statute as written and, therefore, we will not consider what the legislature might have said or add words that the legislature did not include. *JTR Colebrook v. Town of Colebrook*, 149 N.H. 767, 770 (2003). When construing a statute, we first examine the language found in the statute. *Id.* "Although we give undefined language its plain and ordinary meaning, we must keep in mind the intent of the legislation, which is determined by examining the construction of the statute as a whole, and not simply by examining isolated words and phrases found therein." *Id.* (quotation omitted). We construe statutory provisions in a manner that is consistent with the spirit and objectives of the legislation as a whole. *Id.* at 770-71.

Our task is to construe the scope of RSA 49-C:21. The city argues, and we agree, that we must look at RSA 49-B:1 to accomplish this task. The overarching purpose of RSA chapter 49-B is to provide "the statutory framework through which cities and towns may amend their actual forms of government, and grant[] them the power necessary to carry out such changes." LOUGHLIN, *supra* § 34, at 24. RSA chapters 49-C and 49-D work in conjunction with RSA chapter 49-B by providing a limited list of forms of government that are available to municipalities. *See* RSA 49-C:8; RSA 49-D:2, :3. Thus, RSA 49-B:1 provides a framework for construing not only RSA chapter 49-B, but also RSA chapters 49-C and 49-D. Therefore, we consider RSA 49-B:1 in determining the scope of authority granted to municipalities by RSA 49-C:21.

█ The legislative directive in RSA 49-B:1 provides that "this chapter shall be strictly interpreted to allow towns and cities to adopt, amend, or revise a municipal charter relative to their form of government so long as the resulting charter is neither in conflict with nor inconsistent with the general laws or the constitution of this state." In light of this legislative directive, we have recognized that RSA chapter 49-B "provides the statutory framework through which cities and towns may amend their actual forms of government, and grants them the power necessary to carry out such changes." *Town of Hooksett v. Baines*, 148 N.H. 625, 628 (2002) (quotation omitted). We have, however, cautioned that "the constitutional authority supporting RSA chapter 49-B in no way provides or suggests

that the towns, cities or other subdivisions of this State should have the right to exercise supreme legislative authority." *Id.* (quotation omitted). In other words, when a municipality exceeds the authority granted by RSA chapter 49-B, it intrudes into the legislative authority of the general court. *See id.* We have thus held that "RSA chapter 49-B grants a municipality only the power necessary to amend its form of government." *Id.* at 629.

Consistent with these limitations, we have held that RSA chapter 49-B permits a municipality with a city council-city manager form of government to adopt a process of citizen initiative and referendum. *Harriman v. City of Lebanon*, 122 N.H. 477, 482-83 (1982). Nonetheless, we noted that, if adopted, a citizen initiative and referendum process could not "intrude" into matters reserved for the city council, and could not contravene the general laws or the constitution. *Id.* at 483.

On the other hand, we have held that a town does not have the authority to enact a rent control ordinance. *Girard v. Town of Allenstown*, 121 N.H. 268, 271-73 (1981) (quotation and brackets omitted). We stated that "towns only have such powers as are *expressly granted* to them by the legislature and such as are *necessarily* implied or incidental thereto." *Id.* at 271 (quotation omitted). We also declined to interpret RSA chapter 49-B "broadly and literally." *Id.* at 272. Instead, we held that the statute "was intended only to provide a statutory framework by which the cities and towns may amend their actual form of government and that RSA 49-B:8 . . . grants only the power necessary to carry out such changes." *Id.* at 272-73.

More recently, we held that RSA chapter 49-B did not authorize the city of Manchester to alter its retirement system by amending the city charter. *Appeal of Barry*, 143 N.H. 161, 165-66 (1998). In *Barry*, the retirement board argued that "Part I, Article 39 of the New Hampshire Constitution and RSA chapter 49-B authorize[d] the city to amend the retirement system because it is part of the city charter, its form of government." *Id.* at 164. We squarely rejected the argument that the city's retirement system was part of its form of government and stated that "RSA 49-B:2 clearly limits the forms of government a municipality may choose, rather than *grants* a municipality unbridled authority to amend its charter." *Id.* at 165.

Finally, in *Baines*, 148 N.H. at 630, we held that RSA chapter 49-B did not authorize a town to amend its charter to impose term limits on city officials. We specifically rejected the town's argument that because former RSA 49-B:2, IV authorized municipalities to regulate "terms of office," the town was authorized to amend its charter to impose term limits. *Id.* at 629-30. In line with our previous holdings, we said that "RSA chapter 49-B

grants a municipality only the power necessary to amend its form of government." *Id.* at 629.

■ In sum, our cases demonstrate that RSA chapter 49-B authorizes municipalities to amend their actual forms of government. *See Harriman,* 122 N.H. at 482-83. Our cases also demonstrate that RSA chapter 49-B does not provide municipalities with the authority to enact rent control ordinances, amend their retirement systems or impose term limits on elected officials because, in doing so, municipalities impermissibly intrude into the legislative authority of the general court. *See Girard,* 121 N.H. at 271-73; *Barry,* 143 N.H. at 165; *Baines,* 148 N.H. at 629-30. In the present case, when the city amended its charter to make the school district into a city department, it did not amend its actual form of government and, therefore, it acted outside of the scope of authority granted to it by RSA chapter 49-B.

Moreover, there is a comprehensive statutory scheme that evidences a legislative intent not to permit municipalities to exercise broad control over the establishment, powers and functioning of school districts. School districts exist as separate entities because the legislature has determined that all school "districts legally organized shall be corporations, with power to sue and be sued, to hold and dispose of real and personal property for the use of the schools therein, and to make necessary contracts in relation thereto." RSA 194:2 (1999). School districts have extensive powers, including the power to raise money, procure land, build schoolhouses, obtain insurance, purchase vehicles and pay debts. RSA 194:3 (1999). In addition, the legislative scheme includes a list of superintendent services that must be provided by each school district, as well as a list of procedures that school districts must follow when adopting a budget. RSA 194-C:4, :9 (1999 & Supp. 2003). The legislature has also created a state board of education that has the authority to manage, supervise and direct the public schools in the State. RSA 186:5 (1999). This comprehensive statutory scheme suggests that, at least with respect to the structure and functioning of school districts, the legislature did not intend to wholly abdicate its supervisory control to municipalities. Accordingly, it would be inconsistent with this legislative intent to adopt the city's argument that the legislature intended to provide municipalities with the authority to merge a school district with the municipal corporation by simply amending the city charter. *Cf. Baines,* 148 N.H. at 631 (explaining that it "would be repugnant to the implied intent of the statutory scheme" to allow a municipality to impose term limits where the "legislature has

created a comprehensive statutory scheme governing elections and has defined the scope of qualifications necessary to obtain elected office").

■ RSA 49-C:20 provides additional evidence of the legislature's intent not to permit municipalities to exercise broad control over school districts. The statute specifically states that a charter "shall provide for" the appointment of numerous officers, including a city clerk, a treasurer, an assessor, a fire chief and a police chief. The statute does not give the city the authority to appoint the superintendent of a school district. Rather, the legislature has expressly given this authority to the local school board. *See* RSA 194-C:5, II(a) (1999).

The absence of any reference to municipal authority over school districts in RSA chapter 49-C, and the existence of a comprehensive statutory scheme for school districts in RSA chapter 194, raises considerable doubt that the legislature intended to cede authority to municipalities to merge school districts with the city government without explicit legislative approval.

To summarize, our cases have narrowly construed the scope of authority conferred upon municipalities by RSA chapter 49-B in light of the legislative directive that it be strictly interpreted. To construe the home rule statutes as broadly as the city suggests would run afoul of our previous decisions holding that RSA chapter 49-B only provides municipalities with the statutory framework through which they can choose and amend their form of government. *See Baines*, 148 N.H. at 628. "RSA chapter 49-B in no way provides or suggests that the towns, cities or other subdivisions of this State should have the right to exercise supreme legislative authority." *Id.* (quotation omitted). We thus conclude that the home rule statutes do not give the city the authority to merge the school district with the municipal corporation.

Finally, the city points to Nashua, Portsmouth and Rochester as examples of municipalities that have created school districts that are city departments. As the trial court correctly noted, however, the Nashua, Portsmouth and Rochester school departments were created by special legislative act. *See* Laws 1923, ch. 227:2 (Nashua); Laws 1905, ch. 212 (Portsmouth); Laws 1891, ch. 241:4 (Rochester). If anything, this suggests that when a municipality seeks to transform the school district into a city department, it must obtain legislative approval. In light of this history, we conclude that in order to merge the school district with the municipal corporation and make the school district a city department, the city is required to obtain legislative authority.

 Because legislative authority had not been obtained for the city to amend its charter to make the school district a city department, we hold that the trial court correctly determined that the school district was entitled to judgment as a matter of law.

*Affirmed.*

BRODERICK, C.J., and NADEAU and DALIANIS, JJ., concurred.