# United States Court of Appeals
## For the First Circuit

No. 17-1192

SIGNS FOR JESUS; HILLSIDE BAPTIST CHURCH,

Plaintiffs, Appellants,

v.

TOWN OF PEMBROKE, NH; PEMBROKE ZONING BOARD OF ADJUSTMENT;
EVERETT HODGE, Code Enforcement Officer, Town of Pembroke, in
both his individual and official capacities,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, U.S. District Judge]

Before

Howard, Chief Judge,
Torruella and Barron, Circuit Judges.

Michael J. Tierney, with whom Wadleigh, Starr & Peters,
P.L.L.C. was on brief, for appellants.
Christopher Cole, with whom Megan Carrier and Sheehan Phinney
Bass & Green, PA were on brief, for appellees.

October 7, 2020

**HOWARD**, **Chief Judge**.  The Town of Pembroke, New Hampshire, bans the use of electronic signs in all of its zoning districts except its commercial district (C1) and certain nearby areas.  In April 2015, Hillside Baptist Church -- located outside of these areas -- applied for a permit to install an electronic sign on its property, which would transmit messages provided by Signs for Jesus, a nonprofit corporation.  The Pembroke Zoning Board of Adjustment (the "Board") denied the permit, citing the electronic sign provision in the Pembroke Sign Ordinance (PSO).

After a series of unsuccessful administrative appeals, Signs for Jesus and Hillside Baptist Church (collectively, the "Church") filed a complaint in district court against Pembroke, the Board, and Everett Hodge, the Town's Code Enforcement Officer (collectively, the "Town"), alleging violations of the United States Constitution, the New Hampshire Constitution, the Religious Land Use and Institutionalized Persons Act (RLUIPA), and certain New Hampshire zoning laws.  Both parties filed cross-motions for summary judgment.  The court granted the Town's motion and declined to exercise supplemental jurisdiction over the Church's state statutory claims.  The Church now appeals that ruling.  Because we conclude that the Town has met its summary judgment burden on all counts, we affirm.

## A. Regulatory Framework

The stated purpose of the PSO is to "[p]romote" street safety, "[r]educe distractions and obstructions," "[d]iscourage excessive visual competition," and "[p]reserve or enhance town character." Pembroke, N.H., Code ch. 143, art. VIII, § 143-57. To that end, the PSO requires that individuals and businesses desiring to install signs submit applications for permits to the Town's Code Enforcement Officer, who is authorized to issue a permit "only if [he] determines that the sign complies with, or will comply with all applicable provisions of [the PSO]." Id. § 143-59A(3). Certain types of signs, such as political and "for sale" signs, however, are exempt from the permit requirement. Id. § 143-59A(8)(a)-(e).

Regardless of whether a sign is exempt from the permit requirement, it is always subject to a "Dimensional Table of Signs" in Section 143-62, which specifies the types of signs that are allowed in each zone of Pembroke. See id. §§ 143-19, 143-62. Pursuant to a March 2012 change to the table, at the time of the Church's application, "Electronic Changing Signs" were banned from all zones, except in C1 and certain lots "directly abutting Pembroke Street." Id. § 143-63X.

While the PSO restricts "permitted signs" to signs that "conform to the provisions of [the sign ordinance]," it specifies

that two types of signs are always allowed under the PSO.  First, "[s]igns which are required by federal, state or municipal laws" are categorically allowed under the PSO.  Id. § 143-58A.  Additionally, a separate provision allows "non-conforming sign[s] lawfully existing at the time of adoption" of the PSO to "continue," unless such signs pose safety problems under the PSO.  Id. § 143-58G(1).

**B. Facts and Procedural History**

Hillside Baptist Church, located in the Limited Office (LO) District in Pembroke, displayed a sign on its property that conveyed religious messages and could be changed manually.  In April 2015, the Church applied for a permit to install an electronic sign that could be remotely programmed to display different religious messages each day, with messages provided by Signs for Jesus.

Hodge denied the Church's application, on the ground that the Church is located in a zone where electronic signs are prohibited.  At the time, there were three electronic signs on the same road as the Church.  The first was a gas station sign in the LO district, which predated the adoption of the PSO.  The second was a sign on the property of Pembroke Academy, a public school in the Residential District, which posted messages advertising school

- 4 -

events.[1]  The third sign was a temporary electronic sign, erected during the summer of 2015 by the New Hampshire Department of Transportation (NHDOT) to inform motorists of possible construction delays.[2]

Following Hodge's denial of its application, the Church filed an administrative appeal and variance request with the Board. After a public hearing, the Board denied both the Church's appeal and its request for a variance.  In its Notice of Decision, the Board emphasized that allowing the electronic sign would "detract from the rural character of the Route 3 corridor," and noted that the municipality's interest in maintaining the area's rural character was "compelling."  The Church moved for a rehearing, but the Board again denied the appeal and variance request in October 2015.

The Church responded to these rejections by filing a complaint in the district court.  After first determining that the Church had standing to challenge only the electronic sign provision, the district court granted the Town's motion for summary

---

[1] Pembroke Academy is operated by School Administrative Unit 53, a political subdivision within the state.  See N.H. Rev. Stat. Ann. § 507-B:1.

[2] In his declaration submitted to the district court, Hodge testified that he was aware of "two temporary" NHDOT signs.  The Church mentions only one NHDOT sign in its briefing.  Whether NHDOT erected one or two signs does not affect our analysis of any of the Church's claims.

judgment with respect to the Church's constitutional and RLUIPA claims, and declined to exercise supplemental jurisdiction over the complaint's state statutory claims. See Signs for Jesus v. Town of Pembroke, 230 F. Supp. 3d 49, 57-68 & n.14 (D.N.H. 2017). This appeal followed.

The Church maintains that the court erred in holding that the PSO does not violate the First Amendment's free-speech guarantees. As it did in the district court, the Church argues that it has standing to pursue a First Amendment challenge to the PSO as a whole, both facially and as applied. And it also contends that it has standing to challenge the electronic sign provision in particular, again both facially and as applied.

In addition to its First Amendment claims, the Church also challenges the district court's dismissal of its claims under the Federal and New Hampshire equal protection clauses, as well as its RLUIPA claims. Finally, the Church argues that the district court erred in declining to exercise supplemental jurisdiction over its remaining state law claims.

## II.

We review a district court's grant of summary judgment de novo. Specialty Nat'l Ins. Co. v. OneBeacon Ins. Co., 486 F.3d 727, 732 (1st Cir. 2007). In this case, the Church had also filed its own motion for summary judgment, but "[t]he presence of cross-motions for summary judgment neither dilutes nor distorts th[e]

standard of review."  Id. (quoting Mandel v. Bos. Phoenix, Inc.,
456 F.3d 198, 205 (1st Cir. 2006)).

## A. Standing

Article III, section 2 of the Constitution restricts the
federal judicial power to the resolution of "Cases" and
"Controversies."  U.S. Const. art. III, § 2.  The "case-or-
controversy" requirement is satisfied only where a plaintiff has
"standing" to sue.  Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.,
554 U.S. 269, 273 (2008).  To establish such standing, a plaintiff
must identify an injury in fact that is 1) "concrete,
particularized, and actual or imminent," 2) "fairly traceable to
the challenged action," and 3) "redressable by a favorable ruling."
Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013) (quoting
Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 149 (2010)).
As the party invoking federal jurisdiction, the Church "bears the
burden of establishing these elements."  Lujan v. Defenders of
Wildlife, 504 U.S. 555, 561 (1992).

The parties agree that the Church has standing to
challenge the electronic sign provision itself with regard to all
of its claims.  In the Church's First Amendment claims in its
appellate briefing, however, the Church focuses on a number of
other regulatory provisions that it contends are content-based.
Those provisions include exemptions from the permitting
provisions, various categories of signs for which special rules

- 7 -

and conditions apply, and two provisions addressing government-related signs. And, the Church contends that, in light of these provisions, the electronic sign provision is itself impermissibly content-based and is unconstitutional under the First Amendment. To the extent that the identified exemptions allow a sign to circumvent the requirements of the electronic sign provision, there is no standing problem with that contention, as the parties seem to agree.

Insofar as the Church's argument nevertheless fails, because even though those exemptions may be content-based they do not exempt a proposed sign from complying with the electronic sign provision, the Church appears to have a fallback argument. That argument suggests that the Church has standing to challenge the PSO "as a whole" on the basis of the content-based exemptions, no matter whether those exemptions are relevant to the Town's denial of the Church's request. Because the Church advances no affirmative argument that the electronic sign provision is not severable from different parts of the PSO that may be content-based, though, it has no standing to challenge those provisions on this basis.[3] See Ayotte v. Planned Parenthood of N. New Eng., 546

---

[3] To the extent the Church relies in arguing otherwise on Reed v. Town of Gilbert, 576 U.S. 155 (2015), which did not address standing, it is mistaken. In Reed, a church pastor was cited for violating a sign ordinance that treated signs differently based on the content of their message. 576 U.S. at 160-61. It was clear in Reed that if the communicative content of the pastor's

- 8 -

U.S. 320, 328-29 (2006) ("[W]hen confronting a constitutional flaw in a statute, . . . . [w]e prefer to . . . sever its problematic portions while leaving the remainder intact . . . ."); Sabri v. United States, 541 U.S. 600, 609-10 (2004) (expressing disapproval of facial challenges "of th[e] sort" where a party claims "the statute could not be enforced against him, because it could not [constitutionally] be enforced against someone else").

The Church also challenges the electronic sign provision facially on the ground that it confers unbridled discretion to the Town to determine which signs to deem as electronic changing signs subject to the strictures of the provision.[4] See City of Lakewood

---

sign had been different, the town there would have subjected the sign to more favorable treatment. Id. For that reason, the pastor's injury was fairly traceable to the disparate treatment of his sign relative to other signs falling within the ordinance's various other content-based sign categories, and thus invalidation of the ordinance as a whole would have redressed the injury. See id. at 164 ("The restrictions in the Sign Code that appl[ied] to any given sign . . . depend[ed] entirely on the communicative content of the sign."). Here, by contrast, the plaintiff's injury is fairly traceable only to the electronic sign provision itself, because that provision barred the plaintiff's sign regardless of whether or not any of the other allegedly content-based provisions of the PSO also applied to the sign. Cf. Maverick Media Grp., Inc. v. Hillsborough County, 528 F.3d 817, 820 (11th Cir. 2008) ("[A] plaintiff whose sign permit applications were denied on the basis of one provision in a county's sign ordinance, but which could have been denied on the basis of some alternate, but unchallenged regulation, does not have a redressable injury.").

[4] While the Church cannot bring this challenge as-applied, because its challenge targets the nature of the discretionary authority delegated to the Town rather than its specific denial of the Church's request to put up its proposed sign, the Church has made a claim that the electronic sign provision is facially invalid

v. <u>Plain Dealer Publ'g Co.</u>, 486 U.S. 750, 758-59 (1988). It has standing to do so. <u>See</u> <u>Van Wagner Bos., LLC</u> v. <u>Davey</u>, 770 F.3d 33, 39 (1st Cir. 2014) ("<u>City of Lakewood</u> does not require a plaintiff to identify instances of self-censorship or content-based decisionmaking before a facial challenge may be mounted. . . . Rather, the federal cases all are in harmony with the Supreme Court's presumption that regulatory schemes exhibiting the features it identified pose those threats."). Insofar as that argument fails, the Church also appears to contend that it has standing to challenge the PSO as a whole facially due to other provisions in the PSO that themselves confer unbridled discretion to the Town to determine which signs to allow. But, so long as those provisions are unrelated to the denial of the Church's sign request, we do not see how the Church could have standing to challenge them, for, again, the Church fails to develop any argument for why these provisions are not severable from the electronic sign provision that formed the basis of the Town's denial of the Church's request. <u>See</u> <u>Sabri</u>, 541 U.S. at 609-10.

Keeping these limitations on the scope of the Church's standing to challenge different portions of the PSO in mind, we proceed to consider the Church's First Amendment challenges to the PSO.

_____

as a conferral of unbridled discretion. <u>See</u> <u>City of Lakewood</u>, 486 U.S. at 758-59.

- 10 -

## B. Content-Based Speech Restriction Claim

The Church first challenges the electronic sign provision as an unconstitutional restriction on its freedom of speech.  The First Amendment, which applies to the states through the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I. Evaluating the constitutionality of a speech restriction first requires a determination about whether the restriction is content based or content neutral.  Reed, 576 U.S. at 165.  "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."  Id. at 163.  Such speech restrictions are subject to strict scrutiny, which requires the government to demonstrate that the restriction advances a "compelling interest" and is "narrowly tailored to achieve that interest."  Id. at 171 (quoting Ariz. Free Enter. Club's Freedom Club PAC v. Bennett, 564 U.S. 721, 734 (2011)).

Content-neutral regulations, by contrast, "serve[] purposes unrelated to the content of expression,"  and are subject to intermediate scrutiny which requires that the restrictions be "narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information."  Ward v. Rock Against Racism,

491 U.S. 781, 791 (1989) (quoting Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 (1984)).

But speech restrictions that are facially content-neutral are considered content-based and thus subject to strict scrutiny if they exhibit a speaker preference that "reflect[s] the Government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say)." Turner Broad. Sys., Inc. v. F.C.C., 512 U.S. 622, 658 (1994); see Reed, 576 U.S. at 163-64. To show that a facially content-neutral regulation is subject to strict scrutiny, the plaintiff must show not only that the restriction distinguishes between speakers, but also that it "reflects a content preference." Reed, 576 U.S. at 170 (quoting Turner, 512 U.S. at 658); see also Ward, 491 U.S. at 791 ("A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others."). Thus, where the evidence indicates that the challenged regulation was enacted to advance a purpose unrelated to content preference, it is subject only to intermediate scrutiny. See Turner, 512 U.S. at 658-59 (rejecting the application of strict scrutiny to a law preferring broadcasters over cable programmers where its purpose was to promote economic growth for struggling broadcast stations).

## 1.

The parties agree that the electronic sign provision itself is a facially content-neutral restriction. The Church contends, however, that a number of other provisions in the PSO are content-based. Because, as we have explained, the Church only has standing to challenge those other provisions if it is correct that they excuse a speaker from complying with the electronic sign provision, we first consider whether the Church correctly characterizes the allegedly content-based exemptions as limiting the applicability of the electronic sign provision.

On the Church's own account, a number of these exemptions are exemptions from the permit requirement in Section 143-59 of the PSO. The Church makes no sustained argument, however, that this section of the PSO sets forth any exemption that spares a sign from having to comply with the electronic sign provision. Moreover, the plain text of the PSO indicates that the electronic sign provision applies notwithstanding whether any of the exemptions set forth in Section 143-59 apply. For, while Section 143-59 specifically exempts certain signs "from the permitting requirements," it does not exempt them from any other PSO provisions, such as the electronic sign provision. Bolstering this reading, both before the district court and in this court, the Town has maintained that the electronic sign provision is "entirely independent" of the permit requirement from which

Section 143-59 sets forth exemptions.  See Sullivan v. City of Augusta, 511 F.3d 16, 26-27, 29 (1st Cir. 2007) (deferring to a city's interpretation of the applicability of an ordinance where it was supported by the plain text of the statute and was not contradicted by any evidence in the record).[5]

Most of the remaining provisions that the Church characterizes as content-based are provisions in Section 143-63 of the ordinance that lay out different categories of signs and the special conditions that apply to them, as well as corresponding provisions in Section 143-62 that describe the dimensional requirements for each such category of sign.  Because the electronic sign provision falls within these sections of the PSO and itself lays out special rules for "electronic changing signs," the Church contends that, in determining that its proposed sign was an electronic changing sign, the Town necessarily determined that its sign did not belong to any of the allegedly content-based categories of signs identified in Section 143-63.  Had it determined otherwise, the Church suggests, the Town could not have deemed the Church's sign to be an electronic changing one.

Here too, though, the plain text of the PSO stands in the Church's way.  Nothing in the PSO precludes a sign from being

--------

[5] The Church makes no argument that being subjected to the permitting process itself constitutes an injury for standing purposes even though its proposed sign is prohibited no matter whether it is subject to that process or not.

- 14 -

both an "electronic changing sign" and, for instance, a "Political Sign" or a "For Sale" sign under Section 143-63. If a sign falls under one of these allegedly content-based categories and is also an electronic changing sign, moreover, there is no indication in the ordinance that the sign is exempt from satisfying the requirements of the electronic sign provision. In accordance with this reading of the PSO, the Town represents that if a sign meets the definition of an electronic changing sign, "it is an Electronic Sign, irrespective of the content of its message." We thus accept the Town's reasonable reading of its law. See Sullivan, 511 F.3d at 26-27.

There is one provision in Section 143-63 that bears additional discussion. That provision is the PSO's "public service exception," which not only identifies a category of sign and subjects it to special rules but also provides that "temporary governmental agency signs which carry public-service announcements and notices may be permitted to exceed the dimensional requirements of [the PSO]." Pembroke, N.H., Code ch. 143, art. VIII, § 143-63P. Here, too, the Church asserts that the provision is impermissibly content-based. But, we conclude that this provision, like the others in Section 143-63, does not excuse a sign from compliance with the electronic sign provision.

That exemption, by its own terms, only enables the government to "exceed . . . dimensional requirements" that would

otherwise constrain its choice of signage.  Id.  Despite its easing of these "dimensional" rules, as with the permitting exceptions and the other provisions for special categories of signs, the public service announcement provision does not negate the government's obligation to comply with non-dimensional aspects of the PSO.  As the Town represented to the district court, this provision thus does not "create an 'exemption' from the restriction on electronic signs."  If a qualifying public service announcement were "displayed as an electronic sign," according to the Town, it "would still be banned at the Church's location."

To be sure, the restrictions on electronic signs are regulated in part in a section of the PSO labeled "Dimensional Table of Signs."  But, we see no reason to think that the Town's representation to us that the restrictions are not "dimensional requirements" that temporary public service announcements may exceed is incorrect.  Nor does the Church mount an argument for why the Town's reading of the PSO on this point is implausible.  Indeed, in its opening brief, it simply brushes past the question by omitting the portion of the ordinance that references "dimensional requirements" altogether.  And, thus, we accept the Town's reading of its own ordinance, see Sullivan, 511 F.3d at 30, particularly as it avoids a constitutional concern that the contrary reading would create.

The final exception that we need to address that the Church contends is content-based does not appear in either Section 143-59's permitting provisions or Section 143-63's special provisions.[6]  That exception states, without qualification, that "[s]igns which are required by federal, state or municipal laws are permitted."  Pembroke, N.H., Code ch. 143, art. VIII, § 143-58A.  The Town argues that there is no textual basis in the ordinance for concluding that these signs are allowed without the signs having to "conform to the provisions [applicable to other signs]," id., but we are not convinced.

Rather than specifically referencing signs required by law, the "conform to" language caveats a different sentence of the ordinance, which reads in full as follows:  "Only signs which refer to any lawful use, permitted use or an approved special exception use as set forth in Article IV of this Chapter shall be permitted, provided such signs conform to the provisions of this article."  Id. (emphasis added).  While the required-by-law exemption appears in the same subsection of the ordinance as the provision with the

---

[6] At oral argument, the Church suggested that it had standing to challenge yet other exemptions in the PSO related to electronic signs, namely, the time and temperature exceptions and the provisions allowing holiday lights.  These arguments, however, were only cursorily mentioned in the briefs and are accordingly waived.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

language regarding conformance with the provisions of the article, the required-by-law exemption is codified in a sentence that is displayed in a box separated off from the rest of the text of the ordinance, including the conformance language that the Town reads as qualifying the exception. Thus, there is no reason to conclude that signs required by law, which the ordinance generally deems to be "permitted," are only "permitted" if they "conform to the provisions of this article." Such signs are allowed even if they violate the electronic sign provision, and the ordinance draws a distinction in its application of the electronic sign provision between signs required by law and the sign the Church requested to display. Even with the limitations on the scope of the Church's challenge that we have recognized, then, the Church may challenge the electronic sign provision as expressing a preference for government speakers based on this assertedly content-based exemption from it.

**2.**

The Church contends that the required-by-law exception to the electronic sign provision reflects an impermissible preference for government speech. The district court concluded that the required-by-law exception did not reflect a content preference, however, and proceeded to apply intermediate scrutiny. We agree with the district court's approach.

We have previously found that a broader exemption for government signage did not render an otherwise content-neutral ordinance to be content-based. See John Donnelly & Sons v. Campbell, 639 F.2d 6, 8-9 & n.4 (1st Cir. 1980) (holding that a sign ordinance was content neutral despite excepting "[s]igns of a duly constituted governmental body"). In Campbell, we reasoned that the government signage exception reflected an "appropriate governmental interest" and was "justified by sheer public necessity." Id. at 9 (first quotation quoting Police Dep't of Chi. v. Mosley, 408 U.S. 92, 95 (1972)).

We can identify no reason to reach a contrary conclusion here. The exemption for signs required by state law appears primarily intended to codify the New Hampshire state government's general exemption from local zoning ordinances. See Region 10 Client Mgmt., Inc. v. Town of Hampstead, 424 A.2d 207, 209 (N.H. 1980) ("[Z]oning restrictions do not apply to the State or its agencies 'unless the legislature has clearly manifested an intent that they shall.'") (quoting City of Portsmouth v. John T. Clark & Son, Inc., 378 A.2d 1383, 1384 (N.H. 1977)). Moreover, this state government exemption from local zoning ordinances extends to other government subdivisions, including school districts. See City of Manchester Sch. Dist. v. City of Manchester, 843 A.2d 966, 972 (N.H. 2004) ("[T]here is a comprehensive statutory scheme that evidences a legislative intent not to permit municipalities to

exercise broad control over the establishment, powers and functioning of school districts."). The underlying purpose of the state law exemption is to allow New Hampshire to carry out "legitimate state functions," unimpeded by the cost of complying with the variable signage restrictions across different municipalities and zones within those municipalities. Region 10 Client Mgmt., Inc., 424 A.2d at 209 (quoting John T. Clark & Son, Inc., 378 A.2d at 1384-85).

To the extent that the ordinance also exempts signs that state or federal law requires non-governmental entities to display, moreover, it merely reflects the limits of the Town's authority to regulate behavior that these other governmental entities require. See Prolerized New Eng. Co. v. City of Manchester, 103 A.3d 217, 221 (N.H. 2014) (holding that a local ordinance is preempted where it "permits that which a State statute prohibits or vice versa" (quoting N. Country Envtl. Servs. v. Town of Bethlehem, 843 A.2d 949, 954 (N.H. 2004))); Hillsborough Cnty. v. Automated Med. Labs., Inc., 471 U.S. 707, 713 (1985) (noting that state law must give way when "compliance with both federal and state regulations is a physical impossibility" and that "for the purposes of the Supremacy Clause, the constitutionality of local ordinances is analyzed the same way as that of statewide laws" (first quoting Fla. Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43 (1963))). And, while we note that the PSO

exception for legally required signs extends to signs required by "municipal laws" as well as state and federal laws, we read the reference to "municipalities" in the required-by-law exemption to only reflect that fact that, as we have noted, state law prohibits the Town from regulating the land use of other municipalities, like school districts. In line with this reading, the Church fails to identify any laws imposed by the Town of Pembroke itself that would require the use of electronic signs that would otherwise violate the terms of the PSO, much less any specific signs that are required by such laws.

It is true that Campbell predates the Court's decision in Reed, which held that facially content-discriminatory laws cannot be content-neutral. See 576 U.S. at 165-66. But, while the law at issue in Campbell was speaker-based, it was content-neutral on its face, see 639 F.2d at 8-9 & n.4, and Reed recognized that such laws are only subject to strict scrutiny when the speaker-based discrimination "reflects a content preference," 576 U.S. at 170 (quoting Turner, 512 U.S. at 658). Thus, Campbell's holding on this point remains good law.

Accordingly, because the exception for legally required signs only reflects the existence of external limits on the Town's power to regulate the signs displayed or required by other governments, it is neither speaker-based nor content-based. The Town has applied the electronic sign provision equally to all signs

that are within its power to regulate; the required-by-law exception merely acknowledges a legal limit to the scope of that power.

**3.**

Separate from any exemptions in the PSO itself, the Church argues that restricting the allowance of electronic signs to the C1 district -- and requiring churches to apply for variances in order to locate in that district -- reflects a preference for commercial speech and thus is content-based in that respect. But, the Town's treatment of electronic signs by the Town's zoning scheme is not a content-based or speaker-based restriction, because it applies equally to all property owners within their given area of the Town. All property owners within the C1 district and certain nearby lots abutting Pembroke Street, including the two churches that have applied for and received variances to locate in the C1 district, can display electronic signs adhering to certain requirements on their property. All property owners outside those areas cannot. Thus, the ordinance simply imposes a location-based restriction on speech.

We recognize that a location-based restriction on speech, like other facially content-neutral laws, may be treated as content-based if it "cannot be 'justified without reference to the content of the regulated speech,' or [was] adopted by the government 'because of disagreement with the message [the speech]

conveys,'" Reed, 576 U.S. at 164 (second set of alterations in original) (quoting Ward, 491 U.S. at 791).  But, here, the Church develops no argument for why the locational rules imposed on churches are a pretext for the Town to regulate the content of speech with regard to the use of electronic signs.  Thus, this aspect of the Town's ordinance is also a content-neutral time, place, and manner restriction on speech, which we subject to intermediate scrutiny.  See Ward, 491 U.S. at 791.

### C. Time, Place, and Manner Speech Claim

The electronic sign provision withstands intermediate scrutiny because it is "narrowly tailored to serve a significant governmental interest."  Ward, 491 U.S. at 796 (quoting Clark, 468 U.S. at 293).  With respect to the Church's proposed sign, the Town asserts an interest in "preserv[ing] the existing neighborhood characteristics and aesthetics, including the rural and natural look of [Pembroke]."[7]  It is well established that, in the realm of content-neutral regulations, aesthetic concerns are significant governmental interests.  See Members of City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 805-06 (1984); Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 507-08 (1981);

---

[7] The district court considered the Town's traffic safety concerns as well, but the Town concedes that traffic safety was not at issue with the Church's proposed sign.  Because the Church is pressing an as-applied challenge here, we accordingly focus on the Town's asserted aesthetic interest.

Naser Jewelers, Inc. v. City of Concord, 513 F.3d 27, 34 (1st Cir. 2008).

We hold that the electronic sign provision is narrowly tailored to achieve this stated goal. A speech restriction is sufficiently narrowly tailored so long as the "regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." Ward, 491 U.S. at 799 (quoting United States v. Albertini, 472 U.S. 675, 689 (1985)). Here, we can identify no basis to doubt that the Town's interest in maintaining its "quaint little New England village" aesthetic would be achieved less effectively without the electronic sign provision. See Naser, 513 F.3d at 35 (concluding that the city's goal of "not rendering [its] visual image and community character to be that of a potential Times Square" would be achieved "far less effectively" absent its ban on electronic messaging signs) (alteration in original).

The Church maintains that the scope of the electronic sign provision nonetheless renders it unconstitutional. It first argues that the provision is underinclusive because the PSO allows property owners to erect "less aesthetically pleasing" signs -- "sandwich board signs" and "neon signs" among them -- without obtaining a permit. However, the First Amendment does not require that a municipality, in advancing its aesthetic interests through a content-neutral regulation, eliminate all possible sources of

visual blight. See Metromedia, 453 U.S. at 511 (concluding that an ordinance allowing onsite advertising while banning offsite advertising satisfied intermediate scrutiny); Vincent, 466 U.S. at 811 ("[T]he validity of the esthetic interest in the elimination of signs on public property is not compromised by failing to extend the ban to private property."). Here, as the district court explained, in banning electronic signs outside of the commercial district, Pembroke has made a reasonable attempt to balance its aesthetic interest with a countervailing interest in economic development. Such a balance does not upset narrow tailoring. See Metromedia, 453 U.S. at 511.

We likewise reject the Church's argument that the electronic sign provision is unconstitutional because it is overinclusive. Although the Town may not "burden substantially more speech than is necessary to further [its] legitimate interests," it need not choose the least restrictive means possible, as "the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." Ward, 491 U.S. at 799-800.[8]

---

[8] We reject the Church's invitation, drawing from language in McCullen v. Coakley, 573 U.S. 464, 495 (2014), to require the Town to "affirmatively prove that less restrictive measures have been tried." In both McCullen and Rideout v. Gardner, 838 F.3d 65 (1st Cir. 2016), another case upon which the Church relies, the connection between the speech restriction and the asserted

- 25 -

Moreover, the electronic sign provision leaves open "alternative channels for communication." Ward, 491 U.S. at 791. To assess whether the alternatives are adequate, we examine "the ability of a party to disseminate its message to the same general audience despite the restrictions at issue." Sullivan, 511 F.3d at 49 (Lipez, J., dissenting in part). Here, the Church remains free to communicate its religious messages to passers-by through its existing, manually changing sign, or through any other non-electronic sign. We doubt that the Church's inability to communicate the same message to the same audience through an electronic sign frustrates its goals, particularly where, as here, the Church has proposed a static electronic sign that "will not flash or scroll." Although the Church maintains that an electronic sign would be a more convenient means of achieving its goals, "[t]he First Amendment does not guarantee a right to the most cost-effective means of distribution." Globe Newspaper Co. v. Beacon Hill Architectural Comm'n, 100 F.3d 175, 193 (1st Cir. 1996)

governmental interest was more tenuous. See McCullen, 573 U.S. at 494-95, 497 (striking down a buffer zone around abortion clinics statewide when "the problem appears from the record to be limited principally to [a single] clinic on Saturday mornings [and] the police appear perfectly capable of singling out lawbreakers"); Rideout, 838 F.3d at 73 (striking down New Hampshire's ban on "ballot selfies" enacted for purposes of reducing voter fraud and coercion despite the fact that the state "ha[d] not received any complaints of vote buying or voter intimidation since at least 1976"). Here, the connection between an electronic sign ban and an interest in preserving a town's rural character is immediately apparent.

(upholding ban on newspaper racks despite the higher cost of employing street vendors). Because the electronic sign provision is narrowly tailored to further the Town's aesthetic interest and leaves open ample alternative channels for communication, we affirm the district court's entry of summary judgment on the Church's free speech claim in favor of the Town.

## D. Unbridled Discretion Claim

There remains one loose end. As we noted before, the Church contends that various provisions of the PSO "grant[] unbridled discretion to determine which signs are and are not permitted without narrow, objective and definite criteria." However, as we have already explained, the Town denied the Church's sign on the basis of its status as an electronic changing sign, and the other provisions that the Church identifies as conferring unbridled discretion do not enable the Town to allow a sign that would otherwise be barred by the electronic sign provision. Nor, as we have already noted, does the Church make any argument that the electronic sign provision would not survive even if the other provisions were invalidated on this ground. Thus, we narrow our focus to the electronic sign provision itself.

That provision describes the "Electronic Changing Signs" it regulates as follows:

> Electronic Changing Signs include, but are not
> limited to, electronic message center (EMC),
> electronic message sign (EMS), and changeable

> copy board (CCB) signs that display
> illuminated messages that can change
> frequently, can flash, display and/or convey
> messages in text, graphics, pictures, symbols,
> multiple colors, rhythms, animation, and/or
> patterns. This sign's message may be changed
> by the electronic switching of lamps,
> illuminated tubes, bulbs, and/or through the
> apparent movement of light. These signs are
> capable of storing and/or displaying single or
> multiple messages in various formats at
> varying intervals.

Pembroke, N.H., Code ch. 143, art. VIII, § 143-63X. The Church contends that the provision's use of the "include, but are not limited to" language gives the Town overly broad discretion to determine what constitutes an electronic changing sign. And, it argues, the Town's treatment of the Church's proposed sign, which the Church characterizes as "static" and not "changing," as falling under the scope of the statute is evidence of the standard-less discretion that the Town has to treat proposed signs as prohibited electronic changing signs.

The Supreme Court has long recognized that "a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint." City of Lakewood, 486 U.S. at 757. The mere existence of some measure of discretion in implementing a licensing regime, however, does not render such a regime constitutionally suspect. Rather, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity," and accordingly,

the Court has upheld even standards for regulating expression that are "undoubtedly flexible" and require officials to "exercise considerable discretion." Ward, 491 U.S. at 794.

Here, the Town's ordinance quite specifically lays out the criteria used to determine whether a sign is an electronic changing sign. These criteria are, as the District Court found, objective ones. It is clear, for instance, that a sign using light bulbs that turn on and off to display a rotating series of textual messages over the course of a day would constitute an electronic changing sign. Moreover, given the well-defined examples that the ordinance identifies as electronic changing signs, we do not read the "including, but . . . not limited to" language in the ordinance as a free-floating grant of authority to treat any sign as potentially falling within the scope of the ordinance, but instead as reaching only other signs similar to the ones specifically identified. See Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 114–15, 121 (2001) ("[W]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.") (quoting 2A N. Singer, Sutherland on Statutes and Statutory Construction § 47.17 (1991)).

The Church contends that the Town's application of the electronic sign provision to the Church's proposed sign, which the Church characterizes as "static," demonstrates that the Town's

reading of the statute must not be so limited, as the Church asks us to conclude that the Church has not proposed a "changing" sign within the meaning of the statute. But, despite its characterization of its own sign, the Church concedes that its proposed sign could "change" as often as once per day, which puts it squarely within the scope of the ordinance. The Church also fails to identify any other reason to suspect the Town applies its statute in anything but the commonsense way we do here. Thus, we see no reason to think that the Town, in reviewing proposed signs under the electronic sign provision, exercises the sort of unfettered discretion that the First Amendment prohibits.

### E. RLUIPA Claims

The Church brings two distinct claims under RLUIPA on appeal, the first under the "equal terms" provision, and the second under the "substantial burden" provision.

### 1. Equal Terms

The "equal terms" provision of RLUIPA provides that "[n]o government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1). The first step in the RLUIPA "equal terms" analysis is to identify a relevant secular comparator. Although several circuits have articulated different approaches, they all generally require that the comparators be similarly

situated with respect to the purpose of the underlying regulation. See, e.g., <u>Lighthouse Inst. for Evangelism, Inc.</u> v. <u>City of Long Branch</u>, 510 F.3d 253, 268 (3d Cir. 2007) ("[A] religious plaintiff under the Equal Terms Provision must identify a better-treated secular comparator that is similarly situated in regard to the <u>objectives</u> of the challenged regulation") (emphasis in original); <u>River of Life Kingdom Ministries</u> v. <u>Village of Hazel Crest, Ill.</u>, 611 F.3d 367, 371 (7th Cir. 2010) (en banc) (holding that plaintiff must point to a similarly situated comparator with respect to "zoning criteria") (emphasis removed).

The Church points to Pembroke Academy and NHDOT as comparators.[9]  Both were allowed to erect electronic signs in the LO (Limited Office) district.  However, the district court rejected Pembroke Academy and NHDOT as viable comparators "because the state has deprived the Town of any power to regulate governmental land uses."  <u>Signs for Jesus</u>, 230 F. Supp. 3d at 67 (citing <u>Primera Iglesia Bautista Hispana of Boca Raton, Inc.</u> v. <u>Broward County</u>,

---

[9] Before the district court, the Church offered the filling station in the LO district as a comparator but does not pursue that argument here.  In its briefing, the Church also posits that commercial entities allowed in the C1 zone are comparators.  However, entities located in the C1 zone are subject to completely different zoning restrictions, which would disqualify them as comparators under any formulation of the test.  Moreover, distinguishing between commercial and non-commercial entities is an "accepted zoning criterion."  <u>River of Life</u>, 611 F.3d at 373.

450 F.3d 1295, 1311 (11th Cir. 2006)).  Here, too, we agree with the district court.

The Town's power to regulate land use is derived from the state.  See N.H. Rev. Stat. Ann. § 674:16; John T. Clark & Son, Inc., 378 A.2d at 1384 ("Cities and towns have only such powers as are granted to them by the state.").  But the Town's regulatory power, as mentioned above, does not extend to regulating governmental land uses, which include any governmental use of land owned or occupied by the state or school district "for any public purpose which is statutorily or traditionally governmental in nature."  N.H. Rev. Stat. Ann. § 674:54.  Accordingly, the PSO's exemption for legally-required signs merely reflects Pembroke's lack of authority to regulate governmental land use.

The Church is not similarly situated with Pembroke Academy and NHDOT because it is not a governmental entity and its proposed sign is not for a public purpose that is statutorily or traditionally governmental in nature.  The Church and its sign are therefore subject to the Town's regulatory authority, while Pembroke Academy and NHDOT are not.  While we agree with the Church that all three entities may be alike in that their signs affect the aesthetic landscape in the LO district in a similar way, the parties are not appropriate comparators for purposes of the RLUIPA

equal terms analysis because only the Church is subject to the regulatory authority of the Town.[10]

This analysis accords with the Eleventh Circuit's decision in Primera. There, the Eleventh Circuit held that a church that was denied a variance was not similarly situated to a school that had been granted rezoning because the entities sought relief from different governing bodies (the school from the zoning board, and the church from the board of adjustment) and sought different forms of relief (rezoning versus a variance). 450 F.3d at 1311-12. Given these differences in regulatory schemes, the court held that the church and the school were not appropriate comparators under RLUIPA. Id. at 1313-14.

The Church also puts forth no evidence that a non-governmental secular entity is treated on other than equal terms, in light of the PSO's objectives. Absent the existence of such a similarly-situated comparator, the Church's equal terms claim

---

[10] The Church cites Digrugilliers v. Consol. City of Indianapolis, 506 F.3d 612 (7th Cir. 2007), for the proposition that the Town is an instrumentality of the state and therefore we must look to the combined effect of the state and municipal law to appreciate the RLUIPA violation. But, Digrugilliers was not engaged in looking for an appropriate comparator under the RLUIPA equal terms analysis as we are here. Moreover, as the district court noted, Digrugilliers "in no way calls into question" the principle that entities who are subject to different regulatory schemes and decision-making bodies are not similarly situated. See Signs for Jesus, 230 F. Supp. 3d at 68 n.12. Without a similarly-situated comparator, our RLUIPA equal terms analysis is halted.

- 33 -

fails.  See River of Life, 611 F.3d at 373 ("[I]f religious and secular land uses . . . are treated the same . . . that is enough to rebut an equal-terms claim.").  We thus hold that the district court correctly entered summary judgment on the Church's RLUIPA equal terms claim.

## 2. Substantial Burden

We proceed to the Church's next RLUIPA challenge, that the electronic sign provision imposes a substantial burden on its religious exercise.  RLUIPA provides:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of . . . a religious assembly or institution, unless the government demonstrates that imposition of the burden . . . is in furtherance of a compelling governmental interest; and is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a).  Although the statute does not define "substantial burden," we have applied a "common-usage understanding[]" of its terms.  Roman Catholic Bishop of Springfield v. City of Springfield, 724 F.3d 78, 95 (1st Cir. 2013).  A "burden" is "[s]omething that hinders or oppresses," or "something oppressive or worrisome," while something "substantial" is "important" or "significantly great."  Id. at 96 (alterations in original) (citations omitted).

We have outlined factors that are helpful in determining whether a particular regulation imposes a substantial burden:

1) "whether the regulation at issue appears to target a religion . . . because of hostility to that religion itself"; 2) whether the regulation was "imposed on the religious institution arbitrarily, capriciously, or unlawfully"; and 3) "whether local regulators have subjected the religious organization to a process that may appear neutral on its face but in practice is designed to reach a predetermined outcome contrary to the group's requests." Id. at 96-97 (citations omitted).

The Town contends that any "inconvenience" the electronic sign provision imposes on the Church cannot be "significant enough to rise to the level of a 'substantial burden' as contemplated by RLUIPA." After all, requiring the Church to continue using a manually changeable, non-electronic sign is hardly an "oppressive" imposition on the Church's religious exercise. Roman Catholic Bishop of Springfield, 724 F.3d at 95; see Westchester Day Sch. v. Village of Mamaroneck, 504 F.3d 338, 349 (2d Cir. 2007) ("There must exist a close nexus between the coerced or impeded conduct and the institution's religious exercise for such conduct to be a substantial burden on that religious exercise"); Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1227 (11th Cir. 2004) ("'[S]ubstantial burden' requires something more than an incidental effect on religious exercise."). As we discussed in the free-speech context, though an electronic sign may be more convenient, the Church nonetheless

remains free to convey its desired messages to the same audience. See id. at 99 ("[T]he mere existence of some expenses does not put 'substantial pressure on [the religious institution] to modify its behavior'") (quoting Bethel World Outreach Ministries v. Montgomery Cnty. Council, 706 F.3d 548, 556 (4th Cir. 2013)); Civil Liberties for Urban Believers v. City of Chicago, 342 F.3d 752, 761-62 (7th Cir. 2003) (holding that law created no substantial burden under RLUIPA even though plaintiff churches "expended considerable time and money" to relocate to certain districts).

But, we need not resolve this case on this ground because the Church does not contend that the extent of the burden imposed by the electronic sign provision, standing alone, constitutes a RLUIPA violation. Instead, the Church focuses its argument on the third factor we have identified as an indicator of the substantiality of the burden imposed on a religious institution, as it contends that the Board "prejudged" its application before denying the Church's permit at the public hearing.[11]

The Church's theory of prejudgment hinges largely on actions that Hodge and members of the Board took prior to the

---

[11] In a footnote, the Church makes reference to the other two factors, arguing that prohibiting churches from the C1 district "targets religious signs" and that the PSO vests "unbridled discretion" in the Code Enforcement Officer to determine whether certain signs are eligible for exemptions. Not only are these arguments underdeveloped and thus waived, but they also target provisions of the PSO that the Church does not have standing to challenge. See supra Part II.A.

Board's meeting in October of 2015.  The record indicates the following facts that the Church identifies as supporting its position.

A week before that meeting, Hodge and the chair and vice chair of the Board, William Bonney and Bruce Kudrick, met with a lawyer to discuss the Church's application for a variance.  Bonney and Kudrick were the only Board members present at the meeting, in order (according to Bonney's deposition), to avoid triggering the requirements for a public meeting.  Such a pre-meeting gathering was "rare," and Bonney could not remember any similar ones during his thirty years on the Board.  At the meeting, on request the attorney provided the Board members a draft motion that would deny the Church's request.  He did not pass on an equivalent draft of a motion for approval.

But, while the Church argues that, on the basis of this evidence, a jury could find that the Board was colluding to deny the Church a permit prior to its October meeting, the evidence could not support that inference.  Bonney testified that the purpose of drafting the motion to deny was to ensure that the Board "knew the motion that we had to make _if_ we were going to deny," and he further testified that he "didn't know whether we were going to approve or deny [the request] until the end of the meeting." (emphasis added).  The Church identifies nothing in the record that would suggest that the Board's explanation for this meeting

was false or that the Board otherwise prejudged the outcome of the Church's request. As Bonney testified, the Board consulted with an attorney because the Church had hired "expensive counsel," who had noted that the Church's request implicated issues of federal law and, again, no evidence contradicts that assertion. Thus, a juror would have nothing but speculation to rely on to conclude that the purpose of the meeting was not, as Bonney testified, to discuss "matters that were outside [the Board's] normal jurisdiction," namely issues related to RLUIPA, which the Board members considered to be more complicated than the standard variance factors that usually guided their decisions.

Accordingly, the fact that the Board had counsel ready is not a basis on which a jury could conclude that the Board improperly prejudged the decision. Likewise, Bonney's uncontradicted deposition testimony was that the Board members only received a draft motion regarding denial, not approval, because a motion for approval would have been simple to draft: "you have to state the reasons for denial" but "you don't have to state the reasons for approval." The Church again fails to note anything in the record that would provide a juror with a reasonable basis to dispute that conclusion.

The Church separately alleges that "the Town doctored the minutes" of the October meeting, which it apparently views as evidence in support of its theory that the Board's denial of the

Church's request for a variance was pre-determined.  But, it neither explains what discrepancies exist between the actual events at the meeting and the recorded minutes nor why any such discrepancies could be best explained by deliberate "doctor[ing]."  To the extent such doctoring occurred, the Church also fails to explain how it would be indicative of a pre-cooked resolution of the Church's request for a variance.  Thus, we treat this aspect of the Church's challenge as waived.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

## F. Equal Protection

The Church next asserts that the Town's disparate treatment of its sign violates equal protection guarantees under both the New Hampshire and United States Constitutions.  See N.H. Const. pt. 1, art. 2; U.S. Const. amend. XIV.  Because the framework used for evaluating claims raised under the Equal Protection Clause of the National Constitution mirrors that used for evaluating claims raised under the equivalent guarantee in the New Hampshire Constitution, we address both claims together.  See In re Sandra H., 846 A.2d 513, 517 (N.H. 2004).

An equal protection claim first requires identifying a similarly-situated individual who has been subject to a different classification, and thus different treatment, under the relevant

law.  See City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985); In re Sandra H., 846 A.2d at 518.  If the plaintiff identifies an appropriate comparator, we then determine the appropriate level of scrutiny.  Under both federal and New Hampshire law, classifications based on suspect classes such as "race, alienage, or national origin," or those affecting certain fundamental rights are subject to strict scrutiny.  See City of Cleburne, 473 U.S. at 440; In re Sandra H., 846 A.2d at 517.  Under New Hampshire law, classifications that implicate an "important substantive right," including "the right to use and enjoy private real property subject to zoning regulations," engender intermediate scrutiny.  Petition of Hamel, 629 A.2d 802, 804 (N.H. 1993); see also In re Sandra H., 846 A.2d at 517-18.

Here, the district court found that the Church's equal protection claims "fail[ed] as a threshold matter" because the Church and Pembroke Academy are not similarly situated.  Signs for Jesus, 230 F. Supp. 3d at 63.  It nonetheless proceeded to analyze the claims and held that, "in any event," the differential treatment withstood constitutional muster.  Id. at 64.

We agree with the district court that the Church and Pembroke Academy are not similarly situated, nor is the Church similarly situated to NHDOT.  Pembroke Academy is a subdivision of the state.  Id.  Likewise, NHDOT is an agency of the state.  See N.H. Rev. Stat. Ann. § 21-L:2.  As already noted, the Town has no

- 40 -

power to regulate either Pembroke Academy's or NHDOT's sign use absent the clearly manifested intent of the New Hampshire legislature to give the Town that power. See Region 10 Client Mgmt., Inc., 424 A.2d at 209. In contrast, the Town's zoning ordinances authorize it to regulate non-governmental entities. See N.H. Rev. Stat. Ann. § 674:16; see also Signs for Jesus, 230 F. Supp. 3d at 64. This is not a case in which the Town has treated a non-governmental religious organization differently than a non-governmental secular organization. In fact, the Town has not treated the proposed comparators at all under its zoning laws because it lacks the legal authority to impose any zoning restrictions on either Pembroke Academy or NHDOT. The governmental entities cannot be comparators because they experienced no treatment against which to compare the Town's treatment of the Church. Even if the Town had attempted to restrict the Pembroke Academy or NHDOT signs, the Town would have had no basis in its zoning power to take action against Pembroke Academy or NHDOT. Hodge himself testified that he signed the permit for the Pembroke Academy sign despite noting that it violated the zoning laws because he "believed state law required [him] to" do so. Accordingly, we affirm the district court's ruling on the Church's federal and state equal protection claims because the Church is not similarly situated to its proposed comparators.

## G. Supplemental Jurisdiction

Finally, the Church asserted state statutory claims challenging the zoning laws before the district court. Having disposed of all the Church's federal claims, the district court declined to exercise supplemental jurisdiction over these claims. Signs for Jesus, 230 F. Supp. 3d at 68 n.14.

We review a district court's decision regarding the exercise of supplemental jurisdiction for abuse of discretion. Allstate Interiors & Exteriors, Inc. v. Stonestreet Const., LLC, 730 F.3d 67, 72 (1st Cir. 2013). We have held that a district court may decline to exercise supplemental jurisdiction when it has dismissed all claims over which it has original jurisdiction, 28 U.S.C. § 1367, and absent certain circumstances inapplicable here, doing so is not an abuse of discretion. See Rivera-Díaz v. Humana Ins. of Puerto Rico, Inc., 748 F.3d 387, 392 (1st Cir. 2014). Thus, the district court did not abuse its discretion in declining to exercise supplemental jurisdiction over the Church's state statutory claims once the federal claims were dismissed.

## III. Conclusion

For the foregoing reasons, the judgment of the district court is **affirmed**.