**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 20-2185**

---

CANAAN CHRISTIAN CHURCH; BURTONSVILLE CROSSING, LLC; BURTONSVILLE ASSOCIATES; MARION G. SAREM,

> Plaintiffs – Appellants,

and

JENNIFER M. SAREM,

> Plaintiff,

> v.

MONTGOMERY COUNTY, MARYLAND; MONTGOMERY COUNTY COUNCIL; ISIAH LEGGETT, County Executive,

> Defendants – Appellees.

----------------------------

AGUDATH ISRAEL OF AMERICA; JEWISH COALITION FOR RELIGIOUS LIBERTY,

> Amici Supporting Appellant.

---

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Theodore D. Chuang, District Judge. (8:16-cv-03698-TDC)

---

Argued:  September 22, 2021                    Decided:  March 22, 2022

Before KING, THACKER, and RICHARDSON, Circuit Judges.

---

Affirmed by published opinion. Judge Thacker wrote the opinion, in which Judge King joined. Judge Richardson wrote an opinion concurring in the judgment.

---

**ARGUED:** Roman Paul Storzer, STORZER & ASSOCIATES, P.C., Washington, D.C., for Appellants. Howard Ross Feldman, WHITEFORD, TAYLOR & PRESTON L.L.P., Baltimore, Maryland, for Appellees. **ON BRIEF:** Blair Lazarus Storzer, STORZER & ASSOCIATES, P.C., Washington, D.C., for Appellant Burtonsville Associates. A. Donald C. Discepolo, DISCEPOLO, LLP, Columbia, Maryland, for Burtonsville Crossing, LLC. Michelle M. Rosenfeld, LAW OFFICE OF MICHELLE ROSENFELD, LLC, Rockville, Maryland, for Appellants. Mark P. Hansen, County Attorney, John P. Markovs, Edward B. Lattner, OFFICE OF THE COUNTY ATTORNEY, Rockville, Maryland; Harry S. Johnson, Erek L. Barron, Aaron L. Casagrande, Cara C. Murray, Patrick D. McKevitt, WHITEFORD, TAYLOR & PRESTON L.L.P., Baltimore, Maryland, for Appellees. Christopher Pagliarella, YALE LAW SCHOOL FREE EXERCISE CLINIC, Washington, D.C.; Gordon D. Todd, Lucas W.E. Croslow, Matthew H. Simpson, SIDLEY AUSTIN LLP, Washington, D.C., for Amici Curiae.

---

2

THACKER, Circuit Judge:

In this case, we address whether Montgomery County, Maryland (the "County"), the Montgomery County Council (the "County Council"), and the Montgomery County Executive (the "County Executive") (collectively, "Appellees") complied with the Religious Land Use and Institutionalized Persons Act ("RLUIPA") and the Free Exercise Clause of the First Amendment to the United States Constitution when it denied water and sewer category change requests ("WSCCRs") submitted on behalf of Canaan Christian Church ("Canaan") when Canaan sought to purchase and develop five neighboring pieces of land ("the Property") from the landowners ("the Landowners") (Canaan and the Landowners, collectively, "Appellants"). The land in question has been bound by decades of land use regulations restricting development for both religious and non-religious purposes. Because Appellants were well aware of the difficulties in development of the Property when they entered into the contract to purchase the Property, they could not have a reasonable expectation of religious land use. Further, the land use restrictions are rationally related to the government's interest in protecting the region's watershed. Therefore, we conclude that Appellees did not violate RLUIPA or the First Amendment, and we affirm the judgment of the district court.

I.

A.

Background

The Property includes five adjacent parcels of land in Burtonsville, Maryland, that are restricted from receiving sewer service. Burtonsville Crossing, LLC ("Burtonsville

3

Crossing") owns one parcel (the "BC Parcel"). Thomas Norris ("Norris") and his wife, Elizabeth Norris, are the President and Vice President, respectively, of Burtonsville Crossing. Burtonsville Associates owns one parcel (the "BA Parcel"). Jonathan Jackson is the Managing Partner of Burtonsville Associates. Marion G. Sarem owns one parcel, and Jennifer M. Sarem owns two parcels (collectively, the "Sarem Parcels").

Over time, the Landowners struggled to economically dispose of their parcels. As a result, the Landowners "decided it was necessary to join forces," with one of the more vocal land developers "spearheading [their] efforts" to develop the Property and engage with the County in an attempt to gain relief from the restrictions. J.A. 1377.[1] If they could not prevail in getting the restrictions lifted, the Landowners' alternative plan was to sell the Property to a religious organization because the Landowners believed that land use regulations must submit to "[c]hurch use [which] cannot be denied." *Id.* at 2361.

Toward this end, the Landowners ultimately entered into a contract with Canaan. Canaan sought to purchase the Property in order to build a new church, contingent on the approval of the extension of a public sewer line to the Property. Such an extension requires the approval of a WSCCR by the Montgomery County Department of Environmental Protection (the "DEP") to amend the 2003 Comprehensive Ten-Year Water Supply and Sewerage Systems Plan (the "Water & Sewer Plan"). The amendment process is multi-layered. Per the amendment process, the DEP requests comments on WSCCRs from the Montgomery County Planning Board (the "Planning Board"), among other agencies. The

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

comments are then sent to the County Executive, who sends the application and a recommendation to the County Council. The Planning Board holds a public hearing on WSCCRs and submits its own recommendation to the County Council. The County Council itself will also hold a public hearing before taking action on the WSCCR, by either approving, deferring, or denying the application. The County Council may defer action pending review by the County Board of Appeals for special exception uses. If a WSCCR survives this county approval process, the County submits its approval of a proposed amendment to the state level authority, the Maryland Department of the Environment ("MDE"). MDE then reviews the proposal and makes the final decision to add approved amendments to the Water & Sewer Plan.

B.

Land Use Regulations Affecting the Property

The Property is located within the Patuxent River Watershed in what is known as the Rural Edge Neighborhood ("Rural Edge"). One of the three tributary headwaters for the Patuxent River originates within the Property. Before 1981, the Property was zoned "Rural." A designation of "Rural" means development is limited to "0.2 [dwelling units/acre]," or one dwelling per five acres of land. J.A. 595. In 1981, the Property was classified as "Rural Cluster," meaning a zone with "[l]ow density without public sewer to protect natural resources." *Id.* at 4703. Over the years, the Property has been subject to a number of land use and water plans. The most relevant plans are the 1997 Fairland Master Plan, the 2003 Water & Sewer Plan, and the 2012 Burtonsville Crossroads Neighborhood Plan (the "BCNP").

The 1997 Fairland Master Plan recommended that sewer service not be extended to the area containing the BC Parcel, although water service would be evaluated on an individualized basis. This plan also recommended that water and sewer could be extended to the area containing the BA Parcel on an individual basis for special exception uses, such as elderly housing, child day care centers, or animal boarding.

The 1997 Fairland Master Plan was supplemented by the 2003 Water & Sewer Plan. The Water & Sewer Plan was intended to address "the existing and future water supply and sewerage system needs of Montgomery County." J.A. 814. The first stated objective of the Water & Sewer Plan provides that "water supply and sewerage systems proposed in the plan shall emphasize service to the urbanized areas of the county, [and] shall support the land-use recommendations adopted . . . in County Council-approved local area master plans." *Id.*

The Water & Sewer Plan also contains a Private Institutional Facilities ("PIF") Policy that allows the County Council to consider approving public water and/or sewer services for "buildings constructed for an organization which qualifies for a federal exemption" in areas that are outside the scope of water and sewer service areas. J.A. 824. However, the Water & Sewer Plan expressed concern about "speculative interest in sites because of their potential ability to satisfy the PIF policy requirements, not because a specific private institution has a need for that site." *Id.* at 826. Therefore, the Water & Sewer Plan advised that "[t]he County will likely need to address these institutional uses in the context of its master plans, zoning and subdivision ordinances, and water quality regulations." *Id.* at 827.

6

Under the Water & Sewer Plan, the Property is classified as water and sewer categories W-6 and S-6, respectively, defined as "[a]reas where there is no planned community service either within the ten-year scope of this plan or beyond that time period." J.A. 818. Therefore, in order to be able to build on the Property, Appellants applied for water and sewer category changes to W-3 and S-3, defined as "[a]reas where improvements to or construction of new community systems will be given immediate priority and service will generally be provided within two years or as development and requests for community service are planned and scheduled." *Id.*

While the Water & Sewer Plan remained in effect, the 1997 Fairland Master Plan was then amended and replaced entirely by the BCNP in 2012. The BCNP contained stricter provisions than the 1997 Fairland Master Plan for the properties within the Rural Edge and the specific subzone of the Rural Edge encompassing the Property. The BCNP stated, "no public sewer service should be permitted for any use." J.A. 695.

## C.

### History of the Property

Unfortunately for a prospective buyer, the Property has a history of land use restrictions and of WSCCRs being denied or deferred but never approved, for both secular and religious developments. Over the years, the WSCCR failures have been an impediment to both the development and the sale of the parcels.

7

1.

BC Parcel

In 2002, the previous owner of the BC Parcel filed a WSCCR for the development of residential housing and a dog kennel. In 2003, the County Council deferred the request pending a decision by the County Board of Appeals on a special exception request. That request was never ruled upon. And in June 2005, Burtonsville Crossing purchased the BC Parcel. On July 27, 2009, Burtonsville Crossing filed a WSCCR for the development of a senior housing project on the BC Parcel. On July 19, 2011, the County Council denied this WSCCR.

2.

BA Parcel

In March 1969, Burtonsville Associates purchased the BA Parcel. A Burtonsville Associates representative described the purchase as one meant "to turn a quick profit." J.A. 1376. It did not work out that way, however. For approximately 30 years, Burtonsville Associates failed to "profitably market the land." *Id.*

a.

1997 – 2007

Between 1997 and 2007, Burtonsville Associates filed four WSCCRs. In 1997, Burtonsville Associates filed a WSCCR ("WSCCR BA 1") for an elderly housing development project. The County Council deferred action on WSCCR BA 1 pending approval by the County Board of Appeals for a special exception request. This request was denied in 2000.

8

In 2003, Burtonsville Associates contracted to sell a portion of its parcel to ElderHome, Inc., and filed another WSCCR ("WSCCR BA 2") for a senior housing development project. At the same time, Burtonsville Associates filed a WSCCR ("WSCCR BA 3") "for allowance to build a church or other special exception use." J.A. 167. In October 2004, WSSCRs BA 2 and BA 3 were deferred, and the County Council determined that WSCCR BA 3 needed a "more definitive proposal." *Id.* at 1664. In November 2005, these requests were again both deferred pending approval of a special exception, and both were ultimately denied.

In 2007, ElderHome, Inc., assigned its rights to purchase the BA Parcel to Patuxent Ridge, LLC ("Patuxent Ridge"), and Burtonsville Associates filed yet another WSCCR ("WSCCR BA 4") for an elderly housing development project. Because WSCCR BA 2, which was filed for the earlier elderly housing development proposal, was still pending at the time, WSCCR BA 4 was denied as "premature." J.A. 1704.

b.

New Hope Contracts

In January 2009, New Hope Korean Church ("New Hope") entered into the first of three contracts with Patuxent Ridge to purchase the BA Parcel. The sale was contingent on obtaining water and sewer service for the parcel. However, New Hope was "unaware that the category sewer change was needed," and "just thought that the water and sewer line needed to be extended." J.A. 1104.

On July 27, 2009, Burtonsville Associates filed another WSCCR ("WSCCR BA 5") in an effort to develop the BA Parcel for New Hope. New Hope subsequently terminated

9

the initial contract to purchase the BA Parcel because it was not willing to risk paying a nonrefundable deposit required by the contract as it was "unable to get the assurances [it] needed that [it] could actually build the church that [it] wanted on this property." J.A. 1126. Then, on November 6, 2009, New Hope entered into a second contract with Patuxent Ridge to purchase the BA Parcel. The second contract contained a "Water and Sewer Category Change Contingency" provision that conditioned the sale on the approval of an extension of public water and sewer to the Property. The contract could be terminated if WSCCR BA 5 was not approved by June 30, 2010.

But, for reasons not apparent in the record, New Hope also terminated the second contract, and on April 15, 2010, entered into a third contract with Patuxent Ridge to purchase the BA Parcel. Up to this point, Patuxent Ridge had retained the right to purchase the BA Parcel from Burtonsville Associates. But in May 2010, Patuxent Ridge assigned the right to purchase the BA Parcel to Burtonsville Crossing. Patuxent Ridge also assigned to Burtonsville Crossing its rights under the third contract to sell the BA Parcel to New Hope.

On July 19, 2011, the County Council deferred the New Hope WSCCR BA 5. But New Hope did not pursue the WSCCR BA 5 and instead terminated the third contract in November 2011. Ultimately, in February 2012, New Hope's attorney contacted the DEP and requested that WSCCR BA 5 filed by Burtonsville Associates be withdrawn.

10

3.

Sarem Parcels

The three Sarem Parcels were initially purchased by Parviz and Iradi Sarem in 1977. These parcels were subject to inter-family transfers, and Marion and Jennifer Sarem ultimately became the sole owners of the parcels. Jennifer Sarem[2] has been aware of the restrictions against public water and sewer service on her parcels since purchasing them:

> Q: And that home [on Jennifer Sarem's parcels] utilizes an on-site septic system and well; is that correct?
>
> A: Yes.
>
> Q: And is that because the property is not designated to receive public water and sewer service?
>
> A: Yes.
>
> Q: And has that been the case as long as you've owned the properties?
>
> A: Yes . . . .
>
> Q: And I believe you said that as long as you've owned the properties that they've been outside of the areas that the County has designated for public water and sewer service; is that correct?
>
> A: Yes . . . .

J.A. 1037–41.

---

[2] In a stipulation filed in the district court, the parties agreed to proceed without the testimony of Marion Sarem as she lived in Germany and spoke limited English. Her nephew, Scott Sarem, served as her proxy and representative for the disposition of her property.

D.

Canaan's Contracts and WSCCRs

Canaan is an evangelical Christian church that was established in 1996 in Wheaton, Maryland.  Since that time, Canaan's membership has expanded significantly from roughly 20 to 2,000.  The original church facility was built with a capacity of 250 seats, and the growth of the church ultimately led to overcrowding, a division of worship services into multiple sessions, a restricted amount of programs that could be offered, and a restricted amount of participants those programs could accommodate.  Consequently, Canaan sought to obtain a larger facility to accommodate its religious needs.  Canaan considered the Property as a possibility to fulfill its needs.

On behalf of the Landowners, Norris began discussing the sale of the Property with Canaan's real estate agent, Nurit Coombe ("Coombe"), in February 2013.  Norris assured Coombe that Canaan would have no issues getting sewer access for the Property.  He opined, "the County cannot delay or hinder development in any way, as the *Reaching Hearts*[3] case proves," and committed that the Landowners were "prepared to take [the County] to court" if necessary.  J.A. 2369–2370.  However, Ms. Coombe's independent research, including discussions with representatives of the County, review of the BCNP -- the relevant land and water use regulation -- and the history of the WSCCRs for the

---

[3] Norris is referring to *Reaching Hearts International, Inc. v. Prince George's County*, 584 F. Supp. 2d 766 (D. Md. 2008), *aff'd*, 368 F. App'x 370 (4th Cir. 2010) (per curiam).  In *Reaching Hearts*, discussed *infra*, the district court held that the adjacent Prince George's County had violated RLUIPA when it denied a church's water and sewer category change application.

Property, raised doubts about the accuracy of Norris's assurances as to the feasibility of the development. She conveyed these doubts to Canaan, stating, "[Norris] keeps insisting that we will have no regulations issues getting water and sewer. I so far have gotten different information from the county." *Id.* at 2394B. Yet, when Coombe raised these concerns with Norris, he continued to insist that the BCNP's restrictions "do NOT apply for a church. They are exempt as a matter of law." *Id.* at 2396 (emphasis in original).

Despite the concerns, Canaan proceeded with the contracts on the Property between June and July 2013. In order to get public water and sewer to the Property, the sale was contingent on the approval of WSCCRs. On June 26, 2013, the Landowners submitted four WSCCRs on behalf of Canaan.

However, on July 30, 2013, Canaan notified the Landowners that it would be terminating the contract. Coombe told the Landowners, "the buyers after thorough discussions with attorneys and the county decided that this project has a low probability to go thru [sic]." J.A. 2513. Canaan officially terminated the contract on August 27, 2013.

On May 16, 2014, Canaan entered into a second contract with the Landowners. This contract contained another contingency clause regarding the approval of a WSCCR for the Property. The key difference between this contract and the first contract was that the second contract cited RLUIPA and provided that the Landowners would "at once, in the name of the Church, file actions in the United States District Court for the Southern District of Maryland [sic] or the Circuit Court for Montgomery County" if the category change request was denied. J.A. 2518.

13

During this time, the Canaan WSCCRs remained pending. On May 12, 2015, the County Executive formally submitted a recommendation that the Canaan WSCCRs be denied, citing the BCNP and stating, "The use of the Water and Sewer Plan's [PIF] policy in this instance would be in direct conflict with the [County] Council's recent and specific land use decisions for this part of Burtonsville." J.A. 2551. The County Executive's staff report attached to the recommendation further explained, "Public sewer service for a project located outside the planned envelope, such as the church's development proposal, can often be considered under the Water and Sewer Plan's [PIF] policy. However, the recent amendment to the 1997 Fairland Master Plan, the 2012 [BCNP], makes sewer recommendations for this area . . . . The 2012 [BCNP] specifically recommends against the provision of public sewer service for any use" for the Property. *Id.* at 2577 (emphasis in original).

The report also speculated that public water service could potentially be considered for the Property but noted that "neither the applicants nor the church have indicated that water service alone would accomplish the planned site improvements." J.A. 2577. Indeed, Appellants did not subsequently pursue approval for septic and public water alone, and feasibility studies for this alternative were not conducted while the County was reviewing the submitted WSCCRs. Since the denial of the WSCCRs, the County has determined an 800 seat facility using septic could be feasible.

In June 2015, the Planning Board held a meeting and unanimously voted to recommend denial of the WSCCRs, based on the BCNP. Additionally, the Transportation and Environment Committee -- one of the agencies that submits comments on WSCCRs to

14

the County Executive -- recommended denial of the WSCCRs "given the specific restrictive language included in the 2012 [BCNP]" that "no public sewer service should be permitted for any use" for the Property.  J.A.  695, 2609.  The County Council held a public hearing on the matter on June 23, 2015, and on July 21, 2015, the County Council denied the Canaan WSCCRs.

On September 26, 2016, Canaan and the Landowners modified their 2014 contract to extend the time to file a lawsuit contesting the denials of the WSCCRs.

E.

Procedural History

On November 14, 2016, Appellants brought this action against Appellees, asserting five causes of action: (1) a RLUIPA substantial burden claim; (2) a RLUIPA unreasonable limits claim; (3) a RLIUPA equal terms claim; (4) a First Amendment free exercise claim; and (5) a Fourteenth Amendment equal protection claim.

The parties filed cross motions for summary judgment on all claims.  The district court held a hearing on these motions on September 23, 2020.  On September 30, 2020, the district court denied Appellants' motion for summary judgment and granted summary judgment to Appellees.  On October 29, 2020, Canaan and most[4] of the Landowners appealed three claims: 1) the RLUIPA substantial burden claim; 2) the RLUIPA equal terms claim; and 3) the First Amendment free exercise claim.

_____

[4] Jennifer Sarem does not join the other Landowners in the appeal.

15

II.

We review a grant of summary judgment de novo.  *Calloway v. Lokey*, 948 F.3d 194, 201 (4th Cir. 2020).  A district court may grant summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The facts are viewed in the light most favorable to the non-moving party, but "it is ultimately the nonmovant's burden to persuade us that there is indeed a dispute of material fact. It must provide more than a scintilla of evidence -- and not merely conclusory allegations or speculation -- upon which a jury could properly find in its favor." *CoreTel Va., LLC v. Verizon Va., LLC*, 752 F.3d 364, 370 (4th Cir. 2014) (internal citation omitted).

III.

A.

<u>RLUIPA Substantial Burden Claim</u>

1.

Pursuant to the substantial burden provision of RLUIPA:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution--
>
> > (A) is in furtherance of a compelling governmental interest; and
> >
> > (B) is the least restrictive means of furthering that compelling governmental interest.

16

42 U.S.C. § 2000cc(a)(1).

Unlike in an institutionalized persons RLUIPA substantial burden case, where a plaintiff must show that the defendant pressured him to violate his beliefs, in the land use context, "a plaintiff can succeed on a substantial burden claim by establishing that a government regulation puts substantial pressure on it to modify its behavior" as opposed to its beliefs. *Bethel World Outreach Ministries v. Montgomery Cnty. Council*, 706 F.3d 548, 556 (4th Cir. 2013); *see Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006). This "protects against non-discriminatory, as well as discriminatory, conduct that imposes a substantial burden on religion." *Bethel*, 706 F.3d at 557. If a plaintiff demonstrates that the land use regulation imposes a substantial burden, the defendant must then satisfy strict scrutiny by demonstrating that the land use regulation is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest. *See* 42 U.S.C. § 2000cc(a)(1); *Bethel* 706 F.3d at 558; *Redeemed Christian Church of God (Victory Temple) Bowie v. Prince George's Cnty*, 17 F.4th 497, 510 (4th Cir. 2021).

2.

We utilize a two step analysis to determine whether or not a substantial burden is imposed: we ask (1) whether the impediment to the organization's religious practice is substantial and (2) whether the government or the religious organization is responsible for the impediment. *Jesus Christ Is the Answer Ministries, Inc. v. Baltimore Cnty.*, 915 F.3d 256, 261 (4th Cir. 2019) ("*JCAM*").

17

a.

In the land use context, the impediment is substantial if "the property would serve an unmet religious need, the restriction on religious use is absolute rather than conditional, and the organization must acquire a different property as a result." *JCAM*, 915 F.3d at 261 (citing *Bethel*, 706 F.3d at 557–58).

For instance, the religious facilities in *Bethel* "inadequately serve[d] [the church's] needs," as the facilities were "overcrowded, requiring ushers to turn people away from services and limiting Bethel's ability to offer various programs," causing the church "to hold four services every Sunday, and to shorten services, interfering with [religious practices]," and "creat[ing] a sense of disunity because the congregation [was] divided into so many separate services." 706 F.3d at 558. We concluded that the restrictions on the church were absolute because "the County ha[d] completely prevented Bethel from building any church on its property, rather than simply imposing limitations on a new building," which would have required the church to acquire different property to accommodate its religious needs. *Id.* at 558. However, "[t]he absence of affordable and available properties within a geographic area will not by itself support a substantial burden claim under RLUIPA." *Andon, LLC v. City of Newport News,* 813 F.3d 510, 516 (4th Cir. 2016).

In this case, there is undisputed evidence of an unmet religious need. The burdens described by Appellants are similar to those described in *Bethel*: an overcrowded facility, the need for multiple services to accommodate the number of members, and a lack of space for programs. *Compare* Appellants' Opening Br. at 3–5, *with Bethel*, 706 F.3d at 558. And

18

it is uncontested that if Canaan wishes to build a church of this size with public sewer access, it would need to find a different property.

However, Appellants have not presented evidence that the restriction on religious use is absolute.[5] *See JCAM*, 915 F.3d at 261 (holding that there is "usually" a substantial burden where a property that would serve an unmet religious need is faced with "absolute, rather than conditional," restrictions, which would force the religious organization to acquire another property instead) (citing *Bethel*, 706 F.3d at 557–58). To the contrary, the County indicated during and after its review of the Canaan WSCCRs that alternatives might have been more successful. For instance, the evidence demonstrates the County's consideration of approving religious land use for smaller buildings and for septic with public water service only. During the initial review of the WSCCRs, the County suggested an application for water service only might have different results, but it did not pursue this analysis at the time as it believed Appellants were only interested in developments allowing public sewer service. After the review process, the County also independently conducted a feasibility study and concluded an 800 seat church could probably be operated on the Property using septic. This distinguishes this case from *Bethel*, where the religious

---

[5] The concurrence's discussion of "absolute" versus "complete" prohibitions is a distinction without a difference. *Post* at 33. Not only is the phrase "absolute" consistent with our precedent, common sense indicates that any regulation that "completely prevent[s] [a religious organization] from building any church on its property, rather than simply imposing limitations on a new building," is an absolute restriction on religious land use. *Bethel* at 558. And, while there are other facts we must consider when analyzing a substantial burden claim, *see JCAM* at 261, whether a restriction is absolute or conditional is certainly telling as to the nature of the burden on the religious organization. To prevail on this type of claim, that burden must be substantial.

organization attempted to adapt to the county government's land use restrictions, but the government passed further restrictions making religious use impossible. *See* 706 F.3d at 554.

Nonetheless, Appellants argue the restriction on religious use in this case is absolute despite the fact that the County considered and approved a smaller facility serviced by septic on the Property. Appellants assert that an 800 seat church is well below the 2,000 seat facility Canaan needs and would be "inadequate." Appellants' Reply Br. at 4–5. However, this argument is inconsistent with *Bethel*, inasmuch as Appellants presented no evidence that the County "has completely prevented [Canaan] from building any church on its property, rather than simply imposing limits on a new building." *Bethel*, 706 F.3d at 558. The fact that there are practical and legal restrictions preventing a larger development on the Property does not amount to a RLUIPA substantial burden violation. Therefore, Appellants do not demonstrate that they satisfy the first step in the analysis -- that is, that the impediment on a religious practice is substantial.

b.

As to the second step of the analysis, we consider whether the religious organization had a reasonable expectation of religious land use and whether the burden is self-imposed. *Andon*, 813 F.3d at 515 (citing *Bethel*, 706 F.3d at 557–58). Here, even if the impediment in this case was substantial, Appellants cannot demonstrate they had a reasonable expectation of religious land use.

A burden is self-imposed, for example, where a religious organization "knowingly entered into a contingent lease [or purchase] agreement for a non-conforming property."

20

*Andon*, 813 F.3d at 515. "A self-imposed hardship generally will not support a substantial burden claim under RLUIPA, because the hardship was not imposed by governmental action altering a legitimate, pre-existing expectation that a property could be obtained for a particular land use." *Id.* Consequently, we affirmed the dismissal of the substantial burden claim in *Andon* without applying strict scrutiny to the government's actions. *Id.*

In contrast, burdens on a religious organization may not be self-imposed where the organization acquires land with a reasonable expectation of land use but the government subsequently makes development and use practically impossible. For instance, the church in *Reaching Hearts International, Inc. v. Prince George's County* submitted WSCCR applications and modified its development plans in response to land use restrictions that changed between its application attempts. *See* 584 F. Supp. 2d 766, 785 (D. Md. 2008), *aff'd*, 368 F. App'x 370 (4th Cir. 2010) (per curiam). Although there were no objections to these applications at public hearings or otherwise during the process, the applications were denied. *See id.* at 774–75, 779. Meanwhile, secular applicants, including a property in the same area, were approved. *See id.* at 775. In *Reaching Hearts*, the county relied on environmental reasons as its justification for denying the church's application, citing concerns about development next to a reservoir and the impact on water quality. However, it "did not adduce *any* evidence at trial that demonstrated that an approval of any of [the church's] applications would have any impact—much less a negative impact—on [the reservoir]. [The county] did not produce any data, studies, or reports on this issue," nor did the county demonstrate why the church's use of the land would impact the reservoir differently than other surrounding properties. *Id.* at 788 (emphasis in original). The district

21

court in *Reaching Hearts* found the county's reasons for denying the church's applications were pretextual. *See id.* The district court further determined the passage of a land use restriction that only affected the church's property between its applications was not the least restrictive means of the government achieving a compelling interest, if there had been one. *See id* at 783, 788. As such, the county's actions in *Reaching Hearts* failed strict scrutiny.

Appellants suggest this case is akin to *Reaching Hearts* or *Bethel*, where "a religious organization buys property reasonably expecting to build a church, [but] governmental action imped[es] the building of that church." *Bethel*, 706 F.3d at 557. But this case more closely resembles *Andon*. While *Reaching Hearts* and *Bethel* dealt with land use regulations being changed *after* the purchase of property by a religious organization, *Andon* describes a situation where parties "knowingly entered into a contingent lease agreement for a non-conforming property." *Andon*, 813 F.3d at 515. The latter is the case here. Appellants' burdens were "self-imposed hardships." *Id.* As a result, Appellants could not have a reasonable expectation that the Property could be used as a church.

Appellants assert that they had a reasonable expectation of approval of the WSCCR based on the Water & Sewer Plan's PIF Policy, which allowed for qualifying institutions to be considered for approval of public water and sewer. While it is undisputed that Canaan qualifies as a PIF, the Water & Sewer Plan's PIF Policy is not the controlling regulation. Rather, the controlling regulation is the master plan, the BCNP. The Water & Sewer Plan states "water and sewer service decisions should follow and implement the land use and development guidance established in the County's General Plan and local area master

22

plans." J.A. 820. The Water & Sewer Plan further emphasizes that PIF uses must be considered "in the context of [the County's] master plans." *Id.* at 827. And the relevant master plan here, the BCNP, clearly expresses that sewer is not to be extended to this Property "for any use." *Id.* at 695.

The undisputed facts surrounding the negotiations for the purchase of the Property, as well as the terms of the contracts themselves, clearly demonstrate that Appellants were well aware of the regulations restricting the Property. Because Appellants knowingly entered into a contingent sale agreement for property that was expressly excluded from receiving public sewer access under the master plan, they could not have had a reasonable expectation of the County approving their WSCCRs for public sewer access.

Appellants also rely on *Reaching Hearts* in an attempt to support their claim that their expectation of religious land use with public sewer access was reasonable under the existing "state of the law *and the track record of the agencies that would be reviewing its application.*" Appellants' Opening Br. 43 (emphasis in original). However, *Reaching Hearts* is not helpful to Appellants in this regard either for a number of reasons.

First, unlike in *Reaching Hearts*, here the County did not pass any land use restrictions affecting the Property *after* Canaan entered into contracts with the Landowners. Next, although the County cites environmental reasons for its denial of the WSCCRs, unlike in *Reaching Hearts*, here the County also provided evidence supporting these concerns. Finally, the "track record of the agencies that would be reviewing" the WSCCRs in this case demonstrates that applications involving the Property, both religious and secular, were not likely to be approved and Appellants knew it. Thus, *Reaching Hearts*

23

does not support Appellants' claim that they had a reasonable expectation of public sewer access for their land use.

Where a plaintiff successfully demonstrates a substantial burden was imposed as a result of the government's actions, RLUIPA requires the government to withstand strict scrutiny by demonstrating how the land use regulation is the least restrictive means of furthering a compelling governmental interest. 42 U.S.C. § 2000cc(a)(1). But because we hold that Appellants had no reasonable expectation of success on the WSCCRs, it is unnecessary to apply strict scrutiny in this case.

## B.

### RLUIPA Equal Terms Claim

#### 1.

RLUIPA also prohibits discrimination against religious land use:

> No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.

42 U.S.C. § 2000cc(b)(1).

We have not yet addressed this provision of RLUIPA. But the Eleventh Circuit has, and it lists the four elements of an equal terms violation as (1) the plaintiff must be a religious assembly or institution, (2) subject to a land use regulation, that (3) treats the religious assembly on less than equal terms, with (4) a nonreligious assembly or institution. *See Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cnty.*, 450 F.3d 1295, 1307 (11th Cir. 2006). The Eleventh Circuit has "also held that a violation of the Equal

24

Terms provision is not necessarily fatal to the land use regulation . . . but 'a violation of [the] equal treatment provision . . . must undergo strict scrutiny.'" *Id.* at 1308. *Primera* further held:

> A plaintiff bringing an as-applied Equal Terms challenge must present evidence that a *similarly situated* nonreligious comparator received differential treatment under the challenged regulation. If a plaintiff offers no similarly situated comparator, then there can be no cognizable evidence of less than equal treatment, and the plaintiff has failed to meet its initial burden of proof.

450 F.3d at 1311 (emphasis in original).

This "similarly situated nonreligious comparator" analysis has been favored by several other of our sister circuits, "with most holding that a comparator for an equal terms claim must be similarly situated *with regard to the regulation at issue.*" *Tree of Life Christian Sch. v. City of Upper Arlington*, 905 F.3d 357, 368 (6th Cir. 2018) (emphasis in original) (citing *Centro Familiar Cristiano Buenas Nuevas v. City of Yuma*, 651 F.3d 1163, 1173 (9th Cir. 2011); *Elijah Grp., Inc. v. City of Leon Valley*, 643 F.3d 419, 424 (5th Cir. 2011); *River of Life Kingdom Ministries v. Vill. of Hazel Crest*, 611 F.3d 367, 371 (7th Cir. 2010)); *see also Signs for Jesus v. Town of Pembroke*, 977 F.3d 93, 109–10 (1st Cir. 2020) ("[S]everal circuits . . . generally require that the comparators be similarly situated with respect to the purpose of the underlying regulation . . . . Absent the existence of such a

25

similarly-situated comparator, the Church's equal terms claim fails."). We find this reasoning persuasive.[6]

2.

For a comparator here, Appellants primarily rely on the example of the Glenstone Museum ("Glenstone"), a secular organization which applied for and received a WSCCR from the County in 2012. Critically, Glenstone is in a different part of the County and was subject to the Potomac Subregion Master Plan ("Potomac Plan"), not the BCNP. While the BCNP had a specific prohibition for the Property against public sewer "for any use," the Potomac Plan only "generally" excluded public sewer service for the area where Glenstone was located. J.A. 323, 695. Appellants argue that the particular differences between the two master plans are not meaningful. Appellants further contend that the PIF Policy and what they refer to as a "newly formulated . . . 'Specific Restrictive Language' policy" are the appropriate land use and decision-making criteria. Appellants' Opening Br. at 2, 52. Appellants contend that under these considerations, Glenstone was treated more favorably than Canaan. We disagree.

---

[6] To the extent that the concurrence relies on the dissenting opinion from *River of Life* to suggest that a comparator is required for an as-applied challenge but not for a facial challenge, *post* at 34, we do not find this to be persuasive. First, we are not bound by a dissenting opinion -- much less one from another circuit. Next, the dissent in *River of Life* advocated rejecting the use of a *similarly situated* analysis, but not the use of a comparator in general. *See River of Life*, 611 F.3d at 386–387 (Sykes, J., dissenting). This makes sense, as the complete rejection of a comparator would be difficult to reconcile with the statute, which explicitly provides that an equal terms claim must involve, or *compare*, a "religious assembly or institution" that has been regulated on "less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1).

a.

The "'Specific Restrictive Language' policy" is not actually a policy articulated by the County. Rather, Appellants simply attempt to convert the County's process for interpreting and applying master plans to WSCCRs into a "policy" to serve Appellants' purposes. In attempt to do so, Appellants emphasize the County's distinction between "specific" prohibitions, such as the BCNP's prohibition against public sewer for the Property "for any use," and "general" restrictions, such as the Potomac Plan's recommendation that the County follow the Water & Sewer Plan, which would "generally exclude" the property Glenstone owned from sewer service with "limited" approvals of service to properties adjacent to existing lines. J.A. 323, 695, 4142. Appellants suggest this distinction between general and specific restrictions in the master plans was a formal policy crafted by the County through the process of reviewing the Canaan WSCCRs. But as noted above, that is not accurate. The County was not using a formal policy to grant or deny WSCCRs based on how general or specific the relevant master plan's language was. Rather, the County was simply interpreting each master plan to determine whether a WSSCR for property falling under that plan could be granted.

b.

Appellants note that Glenstone also qualified as a PIF, and they argue the approval of Glenstone's WSCCR is evidence of disparate treatment by the County. Again, Appellants' continued focus on the PIF Policy misses the mark. Appellants misconstrue the relationship between the PIF Policy and master plans by referencing the PIF Policy in isolation or treating it as controlling over master plans. As previously described, the

27

County's Water & Sewer Plan specifically cautions against reading it or its PIF Policy without consulting the appropriate master plan. In this case, the master plan affecting Glenstone -- that is, the Potomac Plan -- afforded the County more discretion to approve Glenstone's WSCCR than the BCNP, as the Potomac Plan provides that it will only "generally exclude areas zoned for low density development," as Glenstone was, from the extension of public sewer service. J.A. 323. In contrast, the BCNP more broadly prohibits public sewer access to the Property on which Canaan wishes to build by specifically providing that "no public sewer service should be permitted for any use." *Id.* at 695. Therefore, Glenstone and the Property in question in this case are not similarly situated.

c.

Likewise, Appellants fail to identify a comparator subject to the BCNP that was treated more favorably than Canaan. The history of denied or deferred WSCCRs for both religious and secular developments on the Property demonstrate the County's consistency in applying the master plan when reviewing applications for water and sewer extensions. Appellants point out, correctly, that those previous development attempts fall under earlier master plans, with most of the described attempts occurring under the 1997 Fairland Master Plan. It is notable, though, that even under the more lenient 1997 Fairland Master Plan, the County did not approve any of the secular WSCCRs submitted for the Property. Thus, Appellants cannot show the County discriminated against religious land use development for the Property, and their RIULPA equal terms claim fails.

28

C.

First Amendment Free Exercise Claim

Appellants' final claim is that the County violated the Free Exercise Clause of the First Amendment. The Free Exercise Clause provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. Similar to a RLUIPA claim, a free exercise claim in the land use context addresses whether the government's application of a land use regulation unconstitutionally burdens or discriminates against religious exercise.

For the purpose of a free exercise claim in the land use context, a facially neutral and generally applicable regulation is subject only to rational basis review, "even where it has the incidental effect of burdening religious exercise." *Emp't Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 879 (1990); *see Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876–77 (2021) (declining to overrule *Smith*). But, a government restriction that is not neutral but is meant "to infringe upon or restrict practices because of their religious motivation" is subject to strict scrutiny. *JCAM*, 915 F.3d at 261 (citing *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533, 546 (1993)). For instance, where a religious organization alleges that a government decision restricted use of their property in response to community opposition to the religious organization, "[t]his allegedly discriminatory motive triggers strict scrutiny." *Id.* Individualized assessments

29

by the government with a mechanism for granting exceptions also triggers strict scrutiny.

As emphasized in the recent Supreme Court case *Fulton v. City of Philadelphia*:

> The creation of a formal mechanism for granting exceptions renders a policy not generally applicable, regardless whether any exceptions have been given, because it "invite[s]" the government to decide which reasons for not complying with the policy are worthy of solicitude, *Smith*, 494 U.S. at 884, 110 S.Ct. 1595—here, at the Commissioner's "sole discretion."

141 S. Ct. at 1879.

Here, Appellants again assert that the appropriate land use regulations are the PIF Policy and an "improvised policy shift," which Appellants have elsewhere referred to as a "specific restrictive language policy." Appellants' Opening Br. at 50. In the context of their free exercise claim, Appellants argue that these policies are not neutral and generally applicable. Rather, Appellants claim the WSCCR denials were the result of "an individualized determination." *Id.*

Appellants rely on *Fulton* as support for their claim that the WSCCRs were reviewed under a discretionary system that *could* have accorded them an exception. However, as detailed above, the evidence does not demonstrate that the decision to deny the WSCCRs was based on a discretionary policy. Rather, the decision was based on the BCNP, which expressly prohibited the extension of sewer service to the Property "for any use" without exception. J.A. 695. Consequently, *Fulton* is inapplicable.

The concurrence points to the "public health problem exception" language in the BCNP to suggest the master plan's restrictions against public sewer service for the Property contains an exception. *Post* at 38–39. But this is a misreading of the BCNP. The BCNP

30

describes four subzones within the Rural Edge, including the subzone encompassing the Property here.  J.A. 692–697.  The BCNP details specific restrictions for each subzone, in addition to general regulations for the Rural Edge properties as a whole.  The public health problem exception is one such general regulation that affects all of the Rural Edge properties.  But just as the general regulations applicable to the W&S Plan could not supersede the BCNP's specific restrictions for the Property, neither can the BCNP's general regulations for the subzones supersede the more specific and restrictive regulations listed for the Property.

The BCNP is facially neutral and generally applicable, and Appellants fail to offer evidence that the County had a discriminatory motive that would trigger strict scrutiny.  Therefore, rational basis is the appropriate level of review here.  Rational basis review "requires merely that the law at issue be 'rationally related to a legitimate governmental interest.'"  *Bethel*, 706 F.3d at 561 (citing *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 649 (10th Cir. 2006); *Brown v. City of Pittsburgh*, 586 F.3d 263, 284 (3d Cir. 2009); *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 292 (5th Cir. 2001)).

Appellants have not shown that BCNP is not rationally related to a legitimate governmental interest.  To the contrary, as the district court concluded, the County's plan to protect the "sensitive" "tributary headwaters, which originate in the [Property]" is a legitimate interest and the BCNP furthers that interest by restricting development to prevent damage to the watershed.  J.A. 702, 4901.  Thus, the County's actions withstand rational basis review.

31

## IV.

Accordingly, for the reasons set forth herein, we affirm.

*AFFIRMED*

RICHARDSON, Circuit Judge, concurring in the judgment:

I agree with most of Judge Thacker's fine majority opinion and fully agree with its judgment.[1]  I write separately for two reasons.  First, to point out a few minor concerns with the majority's reading of the Equal Terms provision of the Religious Land Use and Institutionalized Persons Act.  Second, to expand on Judge Thacker's Free Exercise analysis because I believe there is a complication that makes this a closer question than it may at first seem.  Neither difference changes my view of the outcome, and I agree that all of Canaan's claims were properly dismissed.

## I.      Equal Terms

I agree with the majority that there are four elements to a prima facie claim under RLUIPA's Equal Terms provision:  "(1) the plaintiff must be a religious assembly or institution, (2) subject to a land use regulation, that (3) treats the religious assembly on less than equal terms, with (4) a nonreligious assembly or institution."  Maj. Op. at 24.  This

---

[1] I agree with much of the majority's reasoning on the Substantial Burden claim. Because it is clear that Canaan did not have any reasonable expectation that the County would approve their request for sewer requests and therefore self-imposed the burden, Maj. Op. at 22, I would not decide the more complex question of whether the burden was substantial.  *Cf. Westchester Day Sch. v. Village of Mamaroneck*, 504 F.3d 338, 352 (2d Cir. 2007) (discussing the absolute/conditional distinction in terms of whether a different plan might be accepted that would "meet the same needs").  But whatever "absolute rather than conditional" means, *Jesus Christ is the Answer Ministries, Inc. v. Baltimore Cnty.*, 915 F.3d 256, 261 (4th Cir. 2019), it cannot require a complete prohibition on all religious uses of land as the majority suggests today, Maj. Op. at 19–20.  The absolute/conditional distinction is a tool courts have used to interpret the phrase "substantial burden," and the category of "burdens" must cover more than bans.  There must be some restrictions on religious use that fall short of outright prohibition that still impose a religious burden.  *See Jesus Christ is the Answer*, 915 F.3d at 260–61 ("land use regulations can substantially burden religious exercise where an organization acquires property expecting to use it for a religious purpose but is prevented from doing so by the application of a zoning ordinance").

33

interpretation is true to the text of the Equal Terms provision, § 2000cc(b)(1), which demands that "[n]o government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." There are, however, a few points of divergence worth discussing briefly.

First, there are at least two ways to bring an Equal Terms claim under RLUIPA, through a facial challenge or through an as-applied challenge, and this case deals only with an as-applied challenge. *See Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cnty.*, 450 F.3d 1295, 1308–09 (11th Cir. 2006). If a locality wrote a zoning law that explicitly gave worse terms to religious assemblies than other assemblies—museums get sewers by the river, but churches don't—that would violate the Equal Terms provision facially. *See, e.g.*, *Digrugilliers v. Consol. City of Indianapolis*, 506 F.3d 612, 614–15 (7th Cir. 2007). If a locality treated religious assemblies worse than nonreligious assemblies in the "processing, determining, and deciding" of otherwise religiously neutral zoning rules—the rule says no institutions can get a sewer by the river, but the museums get an exception in practice that churches don't—that would be an as-applied violation. *See, e.g.*, *Rocky Mountain Christian Church v. Bd. Of Cnty. Comm'rs*, 613 F.3d 1229, 1236–38 (10th Cir. 2010).

In my view, only the as-applied challenge requires the plaintiff to bring forward a comparator of any kind. *See River of Life Kingdom Ministries v. Village of Hazel Crest*, 611 F.3d 367, 387 (7th Cir. 2010) (Sykes, J., dissenting). If the face of a zoning rule gives better terms to the museum than to the church, a plaintiff need not bring forward any

34

comparator because the face of the statute violates the Equal Terms provision of RLUIPA. And any discussion of whether the religious building was similarly situated to a museum would be irrelevant, considering the plain command of the Equal Terms provision.

Here the majority endorses the requirement that a plaintiff bring forward a "similarly situated nonreligious comparator" as many other circuits have. Maj. Op. at 25 (citing *Primera Iglesia*, 450 F.3d at 1311). But given that our case no doubt falls in the as-applied bucket, this holding should not be read to extend beyond this case to potential facial challenges. A zoning rule that said "museums get sewers near the river but churches don't" should not be saved by arguing that churches are somehow not similarly situated to museums in light of the purpose of the regulation.

Second, even in the as-applied context, I do not agree that the nonreligious comparator need be "similarly situated." *See* Douglas Laycock and Luke W. Goodrich, *RLUIPA: Necessary, Modest, and Under-Enforced*, 39 Fordham Urb. L.J. 1021, 1061 (2012). The text of the statute requires that a plaintiff like Canaan prove that they were treated "on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1). As I've said, in a facial challenge, it will be plain whether equal terms have been offered. But the question is more complicated in the as-applied context, where the charge is that the locality has used an otherwise neutral rule to impose unequal terms. And it is here that requiring some comparison might make some sense. *See, e.g.*, *River of Life*, 611 F.3d at 387 (Sykes, J., dissenting).

After all, in an as-applied challenge, the specific facts of the properties, the proposed uses, and the zoning processes will all matter. But requiring a comparator to be "similarly

35

situated" suggests that some similarity is required beyond what the plain text contemplates—that the other building was an assembly or institution, that it was governed by the same zoning law or rule, and that the rule gave the comparator better terms. "Similarly situated" appears to add more, perhaps requiring district courts to consider similarity with respect to the "purpose" of the regulation. *See* Maj. Op. at 25 (citing *Signs for Jesus v. Town of Pembroke*, 977 F.3d 93, 109–10 (1st Cir. 2020) (looking "to the purpose of the underlying regulation.")). The better analysis would simply look at whether the same restrictions are placed on religious and nonreligious assemblies. Congress has instructed us to look to the equality of terms, so we should not look beyond that prescription, especially given that it is easier to determine the equality of terms than the equality of effects or use or purpose. *See* Laycock & Goodrich, *supra*, at 1063.

This analysis won't always mean the religious assembly will get the same outcome as the non-religious assembly: As long as book clubs and churches are both subject to a rule saying, "no buildings with more than 100 seats," it would be acceptable to okay the 85-seat book club and turn down the 15,000-seat megachurch. *See id.* If a locality applies a rule like that equally, it has not violated the equal terms provision, and any further search for similarity between those buildings can only add confusion.

In my view, the language of "similarly situated" will encourage lower courts to look to any difference between properties or uses that could have justified different treatment based on some speculated purpose. *See River of Life*, 611 F.3d at 371 ("'Purpose' is subjective and manipulable."). Thus, while it would not change the result here and maybe

36

not in most cases, we should instead focus on what the provision requires us to look at: whether equal terms were actually applied.

Third, the majority suggests that there is a strict-scrutiny defense to an Equal Terms claim, but I disagree. *See* Maj. Op. at 24. The statutory language can't be read to justify such a defense, especially where the previous subsection regarding substantial burdens explicitly lays out a strict-scrutiny defense and the Equal Terms subsection does not. *Compare* 42 U.S.C. § 2000cc(a)(1) *with* § 2000cc(b)(1). Some courts have suggested that the Equal Terms provision might be unconstitutional without it, going beyond Congress's power under Section Five of the Fourteenth Amendment. *See River of Life*, 611 F.3d at 370. That issue is not before us, and more to the point, the canon of constitutional avoidance operates in ambiguity; it doesn't let us rewrite clear statutory language. *United States v. Locke*, 471 U.S. 84, 96 (1985) (quoting *George Moore Ice Cream Co. v. Rose*, 289 U.S. 373, 379 (1933)).

Whether there is a strict-scrutiny defense is yet another divergence that may not matter in practice. Strict scrutiny is often deadly. And it is hard to imagine a compelling governmental interest that requires treating churches, mosques, and temples differently from the Elks Lodge, the library, and the museum. And further yet, many compelling interests that would pass muster under any strict-scrutiny defense are likely to be represented already in the neutral and equally applicable zoning laws of many towns and cities. Still, we should not add this atextual hurdle.

While these minor differences are worth mentioning, they would not change the outcome here. I agree with the majority that Montgomery County should prevail because

37

the two institutions, Canaan and Glenstone Museum, were governed by separate master plans on account of their different geographic locations.  That alone means that they were not given less than equal terms by the same law or regulation.  As the majority rightly points out, the Glenstone Museum was subject to the Potomac Plan, a master plan covering three towns near Rockville, Maryland and which allowed some leeway for sewer extensions, while Canaan was subject to the Burtonsville Plan, a master plan covering a smaller area about 15 miles east of Rockville and which did not allow a sewer extension for any use.  Because Canaan and Glenstone were subject to the rules of two different master plans—the real source of binding rules about where sewer extensions could go—they weren't treated differently by the same land use regulation.  Thus, Canaan cannot point to any nonreligious institution or assembly that received better terms under the same regulation, so I agree with the majority that Canaan's claim must be dismissed.

## II.     Free Exercise

Here I write to expand on the Free Exercise holding because I believe there is one more thread that needs tying off.  The majority opinion finds that the Burtonsville Plan created a categorical ban on sewers without exception, which is therefore subject only to rational-basis review.  Maj. Op. at 29 (citing *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876 (2021)).  But I read the policy as an *almost* total ban on sewers on the Properties—almost but not quite.  The Burtonsville Plan lays out specific rules for the Properties here—the Northern Properties within the Rural Edge—and those rules say, "no public sewer service should be permitted for any use." J.A. 695.  So no sewer for a museum or a church or a swimming pool.  But a few pages later, the Burtonsville Plan contemplates

38

an exception to that rule: "This Plan recommends against providing public sewer service for Rural Edge properties under any circumstances, *other than for relief of documented public health problems*." J.A. 709 (emphasis added). Taking both of those together, I read the full rule to be that sewers will not be granted *for any use* except in one *certain circumstance*—a public-health problem. That may seem like a small difference, but I believe it changes the Free Exercise analysis, if only slightly.

As the majority says, the Free Exercise clause subjects neutral and generally applicable regulations only to rational-basis review. Maj. Op. at 28 (citing *Emp. Division v. Smith*, 494 U.S. 872, 879 (1990)). The Supreme Court has clarified in recent years what it means for a law to be generally applicable under the Free Exercise Clause. Two notable classes of exceptions make an otherwise generally applicable law subject to heightened scrutiny: (1) where officials may use broad discretion to grant individualized exceptions— call that the unconstrained-discretion rule; and (2) where secular exceptions undermine the government's asserted rationale for the generally applicable law—call that the contradictory-secular-exception rule. I discuss each in turn.

## A.    The Unconstrained-Discretion Rule

The first exception to rational-basis review under the Free Exercise Clause is for those laws and regulations that may otherwise be general and neutral, but which provide for "individualized exemptions." In *Fulton*, the Supreme Court explained that "the creation of a formal mechanism for granting exceptions renders a policy not generally applicable" where it "invites the government to decide which reasons for not complying with the policy are worthy of solicitude." 141 S. Ct. at 1879 (cleaned up). In that case, a process for

39

granting exceptions was committed to a commissioner's "sole discretion," triggering strict scrutiny. *Id.* The *Fulton* court also pointed to *Sherbert v. Verner*, 374 U.S. 398 (1963), as an example of a mechanism for "individualized exemptions." In *Sherbert*, South Carolina denied unemployment benefits to the plaintiff under a law with a "good cause" exception. *Id.* at 401. These examples show that "individualized exemptions" are those that look to the particular justifications of an individual and weigh them under overly flexible and discretionary standards like "good cause" or "necessity" or "reasonableness," and without objective standards. *See also Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 537–38 (1993) (using a standard that looked to whether certain killings of animals were "necessary"). What we're looking for is unconstrained discretion to make essentially ad-hoc decisions about what circumstances warrant an exception. By allowing room for discretionary exceptions, we no longer have a rule of general application, and the First Amendment bristles. *Cf. Forsyth Cnty. v. Nationalist Movement,* 505 U.S. 123, 133 (1992) ("The First Amendment prohibits the vesting of such unbridled discretion in a government official.").

The regulations governing Canaan's sewer application do not, in fact, violate this unfettered-discretion rule because the Burtonsville Plan is binding over the Water & Sewer Plan.[2] Under the Burtonsville Plan, "no public sewer service should be permitted" on

---

[2] It may well be that the unfettered discretion to not enforce the Plan could come from outside the zoning regulations themselves—consider something like prosecutorial discretion that permits nonenforcement of generally applicable criminal laws, *see* Saikrishna Prakash, *The Chief Prosecutor,* 73 GEO. WASH. L. REV. 521, 532, 536–63 (2005). *But see Smith,* 494 U.S. at 884–85 (finding a criminal law generally applicable (Continued)

properties in Canaan's area.  J.A. 695.  There is only one exception to the Burtonsville Plan's rule against sewer in the Northern Properties, but that exception is for "relief of documented public health problems."  J.A. 709.  This is not a procedure that grants some official unfettered discretion to make ad-hoc decisions about which reasons deserve exceptions.  It doesn't use some amorphous, open-ended standard like "feasible" or "appropriate."  Zoning officials can only perform the ministerial task of checking for a documented public-health problem.  They must look to an objective fact about the land:  Is there a documented public-health problem?  If there is, you may get a sewer.  If not, you don't.  So while there is an exemption to the general no-sewer rule for Canaan's property, it is not discretionary in the way that would trigger strict scrutiny under *Fulton*.

## B.    The Contradictory-Secular-Exception Rule

There is another class of exceptions that has gotten more play in recent years. Heightened scrutiny is also triggered when religious exercise is treated worse than any comparable secular activity.  As the court in *Fulton* puts it:  "A law also lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way."  141 S. Ct. at 1877.

The Supreme Court has sometimes referred to this as an exception that ensures that churches receive equal treatment to "comparable secular activity."  *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam) (citing *Roman Cath. Diocese of Brooklyn v.*

---

without discussing prosecutorial discretion).  As Canaan does not suggest that background principles provide the zoning authority with broad discretion to not enforce the Burtonsville Plan, we need not resolve this possibility.

41

*Cuomo*, 141 S. Ct. 63, 67–68 (2020)).  But the phrase "comparable" is not self-defining and may even be misleading.  *Compare Tandon*, 141 S. Ct. at 1297 (comparing at-home religious gatherings to movie theaters and restaurants), *with id.* at 1298 (Kagan, J., dissenting) (comparing instead at-home religious gatherings to at-home secular gatherings).  "Comparable" suggests an all-things-considered test, which involves a potentially infinite set of inputs.  That is not what is meant here.  Much like my discussion of the Equal Terms provision above, where "comparable" and "similarly situated" suggest a wide view, our view here should be more focused.  In *Fulton*, the Court makes clear that we look to the "asserted interests" of a rule and consider whether exempted secular conduct undermines those asserted interests in a similar way to religious conduct.  141 S. Ct. at 1877; *see also Tandon*, 141 S. Ct. at 1296; *Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1185–86 (9th Cir. 2021)(Ikuta, J., dissenting) ("[T]he majority errs at the first step in the framework by focusing on the School District's reasons for offering an exemption, rather than the interest that the School District actually asserts to justify the mandate.").  If the government regulates religious activities while excepting secular activities for which its stated interest equally applies, then it unjustifiably belittles the religious practices.

The *Fulton* court uses *Church of Lukumi* as its example of what counts as a "comparable activity."  141 S. Ct. at 1877.  The City's ban on "unnecessary" killings of animals was essentially gerrymandered to capture the religious animal sacrifice of the Santeria religion but made exceptions for secular practices like butchering, hunting, and extermination.  *Church of Lukumi*, 508 U.S. at 527–28.  The Court began by considering the asserted purposes of the regulation—public health and safety and protection of

42

animals—and then considered whether the secular exceptions cut against those purposes. *Id.* at 543–46. Many did, and that was enough to prove that the law was not generally applicable. Exterminating pests is inflicting harm on animals, allowing hunters to bring carcasses to their homes is a potential threat to public safety, and allowing fisherman to eat their catches without food inspection poses risks to public health. *See id.* Any one of those would have been enough to pull that law out of rational-basis review. Once you have even a single exception that cuts against the justification of a regulation, religious exercise must get that same treatment. *Tandon*, 141 S. Ct. at 1296; *see also Fulton*, 141 S. Ct. at 1877; *Fraternal Ord. of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 366 (3d Cir. 1999) (Alito, J.) (holding that a medical exception to a no-beard policy triggered this exception because it cut against Newark's purpose of making police easily identifiable while an undercover-officer exception did not because it did not cut against the purpose). So instead of "comparable," it may be more accurate to think of this as the "*contradictory-secular-exception*" rule.[3]

This case does not trigger the contradictory-secular-exception rule because a public-health exception does not cut against the asserted public-health interest in keeping sewers out of the watershed. The purpose of the ban on sewers in the watershed is to protect the

---

[3] Some have referred to this as a "most-favored nation" rule. *See Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603, 2612–13 (2020) (Kavanaugh, J., dissenting from denial of application for injunctive relief) (citing Douglas Laycock, *The Remnants of Free Exercise*, 1990 S. Ct. Rev. 1, 49–50). You might think of things that way—once you identify the category of things that cut against the asserted public interest, the religious use must get the best treatment within that category. But because so much work is being done by constructing the category, this doesn't strike me as the most useful framing.

"declining water quality in the Patuxent River Watershed," and thereby, to protect public health and safety, considering that the Watershed provides drinking water to two of Maryland's most populous counties. J.A. 694, 792. Here no exception contradicts that purpose. The only exception is for "relief of documented public health problems." J.A. 709. To get a sewer, a landowner would need to prove an existing public-health emergency, and such an exception would be approved only when the sewer would *improve* public health and safety rather than threaten it. So there's no secular exception that contradicts the public-health and water-quality purposes of the sewer ban.[4]

Because there is no unconstrained discretion here and because there is no contradictory secular exception, the Free Exercise Clause is not offended, and this claim was rightly dismissed.

---

[4] A counterexample may be helpful. Imagine an exception for public schools. The school exception would cut against the purported interest in public health and safety because a school sewer in the watershed—just like most other sewers in the watershed—would threaten water quality. It would do so for an important public purpose, the education of children, but would still trigger this contradictory-secular-exception rule despite its otherwise noble goal.

44